810 F.2d 1289
 55 USLW 2496, 1987-2 Trade Cases 67,662
 CHUCK'S FEED & SEED CO., INC., a corporation, Appellee,
v.
RALSTON PURINA COMPANY, a corporation, Appellant.
South Carolina Defense Trial Attorneys' Association, Amicus Curiae.
 No. 85-2337.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 8, 1986.
Decided Feb. 9, 1987.
Rehearing and Rehearing En Banc Denied March 11, 1987.
 
 Timothy W. Bouch and Brad J. Waring (Young, Clement, Rivers & Tisdale, Charleston, S.C., on brief), for appellant.
 Richard S. Rosen (Susan C. Rosen, Rosen, Rosen & Hagood, Charleston, S.C., on brief), for appellee.
 J. Brantley Phillips, Jr., Natalma M. McKnew, Leatherwood, Walker, Todd & Mann, Greenville, S.C., L. Sidney Connor IV, Nelson, Mullins, Grier & Scarborough, Myrtle Beach, S.C., William H. Davidson, II, Nauful & Ellis, Columbia, S.C., on brief, for amicus curiae.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Ralston Purina Company appeals from the judgment of the United States District Court for the District of South Carolina, based on a jury verdict, that it violated the South Carolina Unfair Trade Practices Act by terminating its dealership relationship with Chuck's Feed & Seed Co. The case raises important questions concerning the scope of the South Carolina statute.I.
 
 
 2
 Chuck's Feed and Seed Co., Inc., under the direction of Charles (Chuck) Lambert, opened a retail feed store in 1972 in Summerville, South Carolina, a suburban area near Charleston. Lambert's store catered to pet owners and small farmers, selling livestock and pet feeds in bags or containers, rather than in bulk. From 1975 until February, 1982, Lambert carried products manufactured by Ralston Purina Company. Although no written dealership agreement was signed, Lambert was regarded as a dealer in Purina's distribution system. As such, he purchased products directly from Purina, and was entitled to resell these products to other retailers who were known as "sub-dealers." Lambert was also authorized to use Purina signs and displays in his store. Purina's District Manager informed Lambert that as long as Lambert continued to sell Purina feed, Purina would not authorize another Purina dealership within ten miles of his store. Purina adhered to that policy during Lambert's tenure as a dealer. Lambert was a successful Purina dealer with a high volume of Purina feed sales.
 
 
 3
 In the summer of 1981, the District Sales Manager for ConAgra Feed asked Lambert if he would be interested in carrying the ConAgra brand. ConAgra is a direct competitor of Purina because the two brands of feed are similar in quality and price. Lambert had previously carried many other brands of feed, but the other brands were less expensive and inferior in quality to Ralston Purina's feed, and Lambert testified that these brands did not compete with Purina. When Lambert informed Purina's District Sales Manager, Michael Munn, that he was considering ConAgra's proposal, Munn initially told Lambert that if Lambert started to carry ConAgra feed, Lambert's Purina dealership would be terminated. Later, Munn returned to Lambert's store and apologized for his earlier remarks. Munn told Lambert that his Purina dealership would not be cut off if he chose to sell ConAgra feed, but that Munn doubted that Lambert could sell both feeds successfully. Lambert thereafter began to sell ConAgra feed as well as Purina feed in his store. On several occasions, Munn expressed concern to Lambert about Lambert's sales of ConAgra. In February, 1982, Purina terminated Lambert's dealership. Purina's stated reason for the termination was "failure to obtain market penetration."
 
 
 4
 Lambert made several attempts to have his dealership reinstated, but was refused. He also attempted to obtain Purina products as a "sub-dealer," but was unable to secure the products at wholesale prices. To offset his declining feed sales, Lambert began to carry pet supplies and exotic birds. Lambert's gross sales, which had remained relatively static during the period of his Purina dealership, increased significantly following his termination, rising from $387,562 in 1981 to $559,167 in 1982 and $717,768 in 1983.
 
 
 5
 Lambert and Chuck's Feed & Seed Co., Inc. filed the present action on January 25, 1983. The complaint sought recovery from Ralston Purina on four causes of action: (1) violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1; (2) violation of Sec. 3 of the Clayton Act, 15 U.S.C. Sec. 14; (3) violation of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. Sec. 39-5-20; and (4) common-law wrongful termination. Ralston Purina moved for partial summary judgment as to the Unfair Trade Practices Act claim, arguing that the Act is unconstitutionally vague. The district court denied the motion. Trial began on March 5, 1985. Following the close of the plaintiffs' case, the district court denied Ralston Purina's motion for a directed verdict on the federal antitrust claims. However, the court granted Purina's motion to direct a verdict for the defendant on the claim for common-law wrongful termination.
 
 
 6
 At the close of all the evidence, the jury was asked to identify its verdict as to each of the remaining causes of action. No other special interrogatories were submitted to the jury. The jury returned a verdict for Ralston Purina on the Sherman Act and Clayton Act claims. However, the jury returned a verdict for the plaintiffs on the South Carolina Unfair Trade Practices Act claim, assessing actual damages at $78,750. The district judge subsequently ruled that Purina's violation of the South Carolina Act was "willful." Pursuant to S.C.Code Ann. Sec. 39-5-140, which prescribes the trebling of damages and the award of attorneys' fees to plaintiffs in cases of "willful" violations, the district judge trebled the damages award to $236,250 and awarded $86,879.75 in attorney's fees and costs, for a total award of $323,129.75. On October 28, 1985, the district court denied Ralston Purina's motion for judgment notwithstanding the verdict. Purina makes four arguments on appeal: (1) that the district court erred in denying its motion for j.n.o.v.; (2) that the South Carolina Unfair Trade Practices Act is unconstitutionally vague; (3) that any violation that it may have committed was not "willful"; (4) that the damages award is unsupported by the evidence.
 
 II.
 
 7
 In reviewing the denial of a directed verdict or judgment n.o.v., the court must consider whether, when the evidence is taken in the light most favorable to the party opposing the motion, there is any substantial evidence to support the jury's verdict. If there is any such evidence, the verdict should be upheld. Evington v. Forbes, 742 F.2d 834, 835 (4th Cir.1984).
 
 
 8
 The South Carolina Unfair Trade Practices Act (UTPA) provides that
 
 
 9
 Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
 
 
 10
 S.C.Code Ann. Sec. 39-5-20(a). Section 39-5-20(b) states that it is the intent of the state legislature that the construction of paragraph (a) should be guided by the decisions of the Federal Trade Commission and the federal courts in interpreting Sec. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. Sec. 45(a)(1).[1] This court has suggested, in dicta, that the UTPA may also extend to conduct which would give rise to a cause of action for wrongful termination under South Carolina common law. Bostick Oil Co. v. Michelin Tire Corp., 702 F.2d 1207, 1220 (4th Cir.1983), cert. denied, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).
 
 
 11
 We need not decide whether the UTPA should be construed to encompass wrongful termination claims, because no such claim has been made out on the facts of this case. In directing a verdict for Purina on Lambert's common-law wrongful termination claim, the district court found the evidence insufficient to support such a common-law claim. Necessarily, then, the court also found evidence insufficient to support an identical claim brought under the label of the Unfair Trade Practices Act. Because we have not been asked to review the district court's ruling on that directed-verdict motion, we must accept the district court's conclusions.
 
 
 12
 We therefore turn to the task of interpreting the independent meaning of the Unfair Trade Practices Act. Like the Federal Trade Commission Act, the South Carolina statute is aimed at two distinct kinds of conduct: unfair or deceptive practices and anticompetitive practices. Only anticompetitive practices are at issue here. The few cases that have interpreted the South Carolina UTPA have not been concerned with the anticompetitive issue. Cf., Clarkson v. Orkin Exterminating Co., 761 F.2d 189 (4th Cir.1985); State ex rel. McLeod v. C & L Corp., 280 S.C. 519, 313 S.E.2d 334 (Ct.App.1984) (both deal with consumer deception). Accordingly, we must look to interpretations of the FTC Act to guide decision under the UTPA insofar as it prohibits anticompetitive conduct.
 
 
 13
 In the area of anticompetitive practices, the FTC Act functions as a kind of penumbra around the federal antitrust statutes. An anticompetitive practice need not violate the Sherman Act or the Clayton Act in order to violate the FTC Act. Federal Trade Comm'n v. Sperry & Hutchinson Co., 405 U.S. 233, 239-44, 92 S.Ct. 898, 903-05, 31 L.Ed.2d 170 (1972). However, the scope of the FTC is nonetheless linked to the antitrust laws. The power of the Federal Trade Commission to declare anticompetitive trade practices "unfair" extends primarily to "trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate those laws." Federal Trade Comm'n v. Brown Shoe Co., 384 U.S. 316, 321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966). The Supreme Court has explained that "[i]t is ... clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act ...--to stop in their incipiency acts and practices which, when full blown, would violate those Acts." Federal Trade Comm'n v. Motion Picture Advertising Service Co., 344 U.S. 392, 394-95, 73 S.Ct. 361, 363-64, 97 L.Ed. 426 (1953). The Federal Trade Commission itself looks to antitrust principles in deciding whether Sec. 5 of the FTC Act has been violated. See Beltone Electronics Corp., Trade Reg.Rep. (CCH), 1979-1983 Transfer Binder, p 21,934 at 22,375.
 
 
 14
 The issue presented by this case is the legality of a dealership arrangement which requires the dealer to deal exclusively in the products of one manufacturer. Such exclusive dealing arrangements have never been per se illegal under the antitrust laws. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 325-29, 81 S.Ct. 623, 627-29, 5 L.Ed.2d 580 (1961). Instead, exclusive dealing arrangements violate the antitrust laws only if they are likely to foreclose the entry into a substantial part of the market of products that compete with the products benefitting from the exclusive dealing arrangement. Id.; Standard Oil Company of California v. United States, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371 (1949); Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356-57, 42 S.Ct. 360, 362-63, 66 L.Ed. 653 (1922). In Tampa Electric Co., the Court explained that "even though a contract is found to be an exclusive-dealing arrangement, it does not violate the [antitrust laws] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327, 81 S.Ct. at 628. In other words, the plaintiff must show that "the opportunities for other traders to enter into or remain in that market must be significantly limited" by the exclusive-dealing arrangement. Id. at 328, 81 S.Ct. at 628-29. Thus, what has concerned the courts about exclusive dealing arrangements is the possibility that a single manufacturer will control all or a substantial number of the available retail outlets for a certain kind of product in a given geographical area. See id. at 327-29, 81 S.Ct. at 628-29; Standard Oil Co. of California v. United States, 337 U.S. at 314, 69 S.Ct. at 1062. When a single manufacturer has exclusive dealing arrangements with a substantial number of the available dealers in an area, it will be difficult for the manufacturer of a competing product to break into the market for that kind of product.
 
 
 15
 In Tampa Electric Co. v. Nashville Coal Co., 365 U.S. at 327-29, 81 S.Ct. at 628-29, the Court outlined the proof necessary to show that an exclusive dealing arrangement violates the antitrust laws. First, the "line of commerce," i.e., the type of goods, must be determined. Id. at 327, 81 S.Ct. at 628. Second, the geographical area of effective competition in that line of commerce must be demonstrated, because "the threatened foreclosure of competition must be in relation to the market affected." Id. Third, the exclusive dealing arrangement at issue must be found to extend to "a substantial share of the relevant market." Id. at 328, 81 S.Ct. at 628. In other words, the plaintiff must show that competing manufacturers are excluded from a substantial share of the relevant market because that share of the market is controlled by the exclusive dealing arrangement. Lower court cases following Tampa Electric Co. have focused on the mathematical figure for the percentage of the market foreclosed due to the exclusive dealing arrangement at issue. Tampa Electric Co. had held that a market foreclosure of 0.77% was not substantial enough to constitute a violation of the antitrust laws. 365 U.S. at 333-35, 81 S.Ct. at 631-32. In subsequent cases, lower courts have disagreed as to the percentage of market foreclosure required to trigger an antitrust violation. Some courts have held that market foreclosure of up to 15% may be insubstantial and therefore lawful. American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1252 (3d Cir.1975) (14.7%); Cornwell Quality Tools Co. v. CTS Co., 446 F.2d 825, 831 (9th Cir.1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 716, 30 L.Ed.2d 740 (1972) (10-15%). On the other hand, market foreclosure of 24% was held to violate the law in Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 676 F.2d 1291, 1301, 1304 (9th Cir.1982), cert. denied, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).
 
 
 16
 The Supreme Court's decision in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), reaffirms and further develops the analysis of the earlier cases. Sylvania was not an exclusive dealing case; rather, it dealt with a manufacturer's territorial restrictions on its dealers. However, the Court's language was broad enough to extend to all "vertical" trade restrictions,[2] including exclusive dealing arrangements. The Court emphasized that the plaintiff in a vertical restraint case must show a significant negative impact on "interbrand" competition--that is, on competition among manufacturers of different brands. Interbrand competition is more important than "intrabrand" competition, which is the competition among dealers in the same market area who sell the same brand. 433 U.S. at 52 n. 19, 54-57, 97 S.Ct. at 2558 n. 19, 2559-61. This emphasis reaffirms the holdings of the earlier cases that the courts' focus in evaluating exclusive dealing arrangements should be on their effect in shutting out competing manufacturers' brands from the relevant market.
 
 
 17
 The Sylvania Court also held, though, that a "rule-of-reason" approach must be applied to vertical restraints. 433 U.S. at 57-58, 97 S.Ct. 2561-62. Under such an approach, a court must consider whether there are any procompetitive justifications for the use of the particular vertical restriction at issue. Arizona v. Maricopa County Medical Society, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). In the context of exclusive dealing arrangements, the application of the "rule of reason" analysis would seem to mean that a court should not look only at the numerical percentage of market foreclosure in order to decide whether or not a particular arrangement is illegal. Rather, after determining that market foreclosure is substantial, the court should consider whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies.
 
 
 18
 The same approach, only slightly more liberal in scope, was applied under Sec. 5(a) of the FTC Act by the Federal Trade Commission itself in Beltone Electronics Corp., Trade Reg.Rep. (CCH), 1979-1983 Transfer Binder, p 21,934 at 22,375, 22,387-95 (1982). There, a manufacturer of hearing aids had engaged in a practice of requiring exclusive dealing arrangements with dealers who sold the hearing aids to the public. The Commission found that Beltone's activities did not violate the FTC Act where its exclusive dealing contracts extended to only 7 or 8% of hearing aid dealers in the relevant market, which there was the national market, where its share of national hearing aid sales had dropped during recent years, and where there was evidence that competing hearing aid manufacturers had little trouble finding dealers to sell their products. Id. at 22,394-95.[3]
 
 
 19
 In summary, the appropriate analysis to apply to an exclusive dealing arrangement under the FTC Act, and therefore under the South Carolina act as well, is as follows. First, the court must determine the nature of the relevant market by identifying the particular type of goods and the geographical area involved. Second, the court must determine how much of that market has been closed off to the products of competing manufacturers because of exclusive dealing arrangements required by the defendant. In conjunction with this, the court should look at all relevant evidence indicating whether or not competitors have found or are likely to find it difficult to enter or remain in the market. Third, the court should consider any procompetitive effects of the exclusive dealing arrangements that would justify their use.
 
 
 20
 Applying this analysis to the present case, it becomes clear that the district court should have granted Ralston Purina's motion for judgment notwithstanding the verdict. Lambert simply failed to offer the relevant evidence concerning the extent to which Ralston Purina may have used exclusive dealing arrangements to "foreclose the market," or, in other words, to keep competing brands of feed out of a substantial percentage of the feed dealerships in the area. Instead, almost all of Lambert's evidence related to his own individual experience with Ralston Purina. That alone is not enough to show a negative impact on competition in the market as a whole.
 
 
 21
 Additional support for judgment n.o.v. on these facts is found in Stearns v. Genrad, Inc., 564 F.Supp. 1309 (M.D.N.C.1983), aff'd on other grounds, 752 F.2d 942 (4th Cir.1984). That case was decided under the North Carolina Unfair Trade Practices Act, which is very similar in language and scope to South Carolina's act. In that case, Carolina Acoustics Company (CAC) alleged that it had been terminated as a dealer of products manufactured by Genrad because CAC refused to deal exclusively in Genrad products. The district court granted summary judgment to Genrad on the Unfair Trade Practices Act claim. Id. at 1318. The court explained that
 
 
 22
 CAC has made no attempt to determine who the other competitors were in the market, whether other distributors were available to those competitors, whether those competitors in fact needed distributors to get their competing products to the consumer, and what, if any, effect the alleged exclusive dealing arrangement may have had upon the ultimate consumer of and competition in the products in question. Nor has CAC made any attempt to show whether other Genrad distributors sold competing lines of products while they were Genrad distributors. In short, CAC has not shown, nor has it attempted to show, any adverse effect on overall competition in any line of commerce or relevant market resulting from the alleged exclusive dealing arrangement.
 
 
 23
 Id. at 1314. Exactly the same failure of proof occurred here.
 
 
 24
 Because we find that there was insufficient evidence to support the verdict in Lambert's favor, we reverse the judgment of the district court. It is consequently unnecessary for us to consider Purina's other claims of error.
 
 
 25
 REVERSED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 26
 I respectfully dissent. I concur with the portion of the majority opinion holding that Lambert presented insufficient evidence of anticompetitive conduct by Ralston Purina Co. I would hold, however, that there was sufficient evidence from which a jury could determine Ralston committed an unfair trade practice under South Carolina's Unfair Trade Practices Act (UTPA) in terminating Lambert's dealership. See Bostick Oil Co. v. Michelin Tire Corp., 702 F.2d 1207, 1220 (4th Cir.), cert. denied, 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).
 
 
 27
 It is true that the district court directed a verdict on Lambert's state common law action for wrongful termination. The trial court, however, visualized the factual predicate for maintaining the common law action as separate from that for upholding an action based on the UTPA. As a result, the court instructed the jury on the necessary factual elements for finding an unfair practice that would violate the statute. The jury found these facts to exist. I would uphold that jury determination.
 
 
 
 [1]
 Section 5(a)(1) of the Federal Trade Commission Act provides:
 Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.
 
 
 [2]
 A "vertical" restriction is one that is embodied in an agreement between a seller and a purchaser of a product, and which restricts the activities of the purchaser with respect to third parties. Any arrangement between a manufacturer and a dealer whereby a dealer agrees not to buy from certain third parties, not to sell to certain third parties, or not to sell in certain locations is a "vertical" restriction. By contrast, a "horizontal" restriction involves agreements between competing sellers or competing buyers
 
 
 [3]
 The Supreme Court's opinion in Federal Trade Commission v. Brown Shoe Co., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966), relied on by Lambert, does not undermine this analysis or set forth a different standard. Brown Shoe involved a manufacturer of shoes who had entered into exclusive dealing arrangements with a large number of shoe retailers. The Federal Trade Commission had concluded that Brown Shoe's activities were unfair trade practices and issued a cease and desist order against the company. The Supreme Court's opinion, which is very short, did not explicitly address the merits of whether Brown Shoe's conduct amounted to an unfair trade practice. Rather, the Court used the occasion to enunciate a more general standard. The Court of Appeals had set aside the Commission's order on the theory that the scope of the FTC Act was no broader than that of the antitrust laws. Because Brown Shoe's activities did not violate the antitrust laws, the Court of Appeals had apparently reasoned, it could not have violated the FTC Act. Id. at 320-22, 86 S.Ct. at 1503-05. The Supreme Court reversed, but held merely that the Federal Trade Commission had the discretion to declare trade practices unfair even when those practices did not violate the antitrust laws. Id. at 321-22, 86 S.Ct. at 1504-05. The Court did not explain why it believed that the FTC was correct in finding a violation of Sec. 5 of the FTC Act, other than to express deference to the agency's authority. The opinion sets forth no standards or guidelines to help a court that must decide in the first instance whether an exclusive dealing arrangement is invalid, rather than review a decision of the FTC