**UNITED STATES of America, Plaintiff,**

v.

**369.31 ACRES OF LAND IN ROANOKE COUNTY, VIRGINIA, et al., Defendants.**

**Civ. A. No. 84–1191–R.**

United States District Court, W.D. Virginia, Roanoke Division.

Oct. 3, 1988.

E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., Aaron S. Bennett, Land Acquisition Section, Land and Natural Resources Div., Washington, D.C., for plaintiff.

John M. Wilson, Jr., Wilson, Vogel, Creasy & Hambrick, Roanoke, Va., for Tobias.

S.D. Roberts Moore, Gentry, Locke, Rakes & Moore, Roanoke, Va., for Harry I. Johnson, Jr., Jolene T. Johnson and George Moore, Trustee.

## MEMORANDUM OPINION

KISER, District Judge.

This controversy arises out of the United States government's condemnation of land in northern Roanoke County, locally referred to as the McAfee's Knob area. The government has settled its dispute with the present litigants and, pursuant to that settlement, money equal to the agreed value of the land is being held in escrow. The dispute between the present litigants is over the money which stands in the place of the land. The parties to the present dispute are Harry I. Johnson, Jr., Jolene T. Johnson, and George Moore, Trustee for Harry I. Johnson, III (Johnson), on one side of the dispute; and Steven Craig Tobias and Constance S. Tobias (Tobias) on the other side of the dispute. Both sides claim legal title to a portion of the land (interlock) which the government condemned and, therefore, claim ownership of the money which represents that portion of the land.

The case was tried and submitted to a jury on a special verdict. The special verdict posed two questions to the jury. The first question asked who had superior paper title to the property, and to that question the jury responded, "Tobias." The second question asked the jury whether Johnson had obtained legal title to the disputed property (interlock) by adverse possession. To that question, the jury answered that Johnson had not obtained title by adverse possession. Johnson has filed a motion for judgment notwithstanding the verdict.[1] The parties have briefed and fully argued the motion, and it is now ripe for decision.

---

1. In addition to the motion for j.n.o.v. Johnson filed a motion for new trial and a motion to charge attorneys' fees and expenses against the escrowed money. Because of the disposition, I make of the motion for j.n.o.v. it will not be necessary for me to reach these motions.

In support of his motion, Johnson asserts the following grounds:

1. Adverse possession was established as a matter of law by the uncontroverted evidence of

a. an easement granted by Johnson to Appalachian Power Company for the erection and maintenance of a high-powered transmission line within the interlock, and

b. the erection of a two-story house within the interlock.

Grounds a and b in the motion for j.n.o.v. are interrelated, and I will address them as a single ground.

In reviewing the evidence on a motion for j.n.o.v., the Court is bound to view the evidence in the light most favorable to the prevailing party giving him the benefit of all favorable inferences that can be drawn from the evidence. In so doing, the motion can be granted only if the Court determines that the evidence is so one-sided that reasonable men could not conclude that it supports a verdict for the prevailing party. *See Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289 (4th Cir. 1987); *Whalen v. Roanoke County Bd. of Sup'rs*, 769 F.2d 221 (4th Cir.1985), *vacated on reh'g on other grounds*, 797 F.2d 170 (4th Cir.1986); *Evington v. Forbes*, 742 F.2d 834 (4th Cir.1984).

The evidence is uncontradicted that on October 26, 1945, Dolan and William Oakie conveyed Parcel A (93 acres) and Dolan, W.M. Oakie and R.W. Oakie conveyed Parcel B (125 acres), and William Oakie conveyed Parcel C (55 acres) to Harry I. Johnson, Sr., Harry I. Johnson, Jr.'s father and immediate predecessor in title. At the time the property was conveyed to Johnson, Sr., a two-story house existed on the premises. The Johnson family used the house for a period of time continuing until at least as late as 1955; by 1957, however, the house stood vacant, in a run-down condition, and evidenced proof of animals living in it.

In 1961, Johnson granted to Appalachian Power Company ("APCO") a twenty-foot-wide transmission line easement, which traversed the interlock in roughly an east-west direction at about the center of the interlock. In 1962, APCO constructed its transmission line on the easement.

A road lead from the public road to McAfee's Knob. Tobias referred to this as the CCC Road (sometimes called the Fire Road) and stated that beginning in 1960 a chain ran across the road at its entrance, requiring that Tobias obtain a key from Howard Rose, an agent of Johnson, to gain access to the property. Evidence was that Johnson improved and maintained this road. There were "no trespassing" signs on the property signed by Johnson. Tobias saw these signs on his visits to the property.

As early as 1958, Tobias knew that Johnson claimed the interlock property, but he never contacted Johnson regarding his claim. Evidence also indicated that Johnson paid a tax on the land for the entire time that he owned it.

In 1965, Johnson completely reconstructed the road from the public road to the house, and then from the house to McAfee's Knob. During the mid–60's, vandalism became a problem, and Johnson hired off-duty deputy sheriffs to patrol the area. Eventually Johnson gave up on keeping the house repaired.

Over the course of the years, Johnson gave permission to various persons and groups to use the property. In 1980, Johnson issued a series of written permission slips.

In 1960 Tobias' grandmother conveyed a one-half interest in the property to Tobias, and in 1973 Tobias purchased the remaining one-half interest from Cassell. Neither Tobias nor his predecessors-in-title ever took actual possession of the property. Tobias made use of the property by hiking on it and hunting on it occasionally (three to four times between 1958 and 1960). Neither Tobias nor any of his predecessors-in-title, however, legally challenged Johnson's possession or claim of ownership until Tobias intervened in this lawsuit on September 23, 1985.

The facts in this case present a situation where Tobias, who has superior paper title to the interlock, had only constructive pos-

session of the property, versus Johnson, who had actual possession of the property, but had inferior paper title. The issue to be resolved, then, is whether Johnson's actual possession was of sufficient quality and duration to oust Tobias' constructive possession, thereby allowing Johnson to gain title to the property by adverse possession.

Before getting into the legal requirements of adverse possession, it is appropriate to note that my analysis starts from the time that Johnson, Sr. acquired Parcels A, B, and C in October of 1945. I think it is appropriate to start my analysis at this point because it does not appear from the facts in the case that Johnson must rely on his predecessors-in-title to establish his adverse possession. More important, though, when the three parcels were conveyed to Johnson, Sr., they lost their identity as three separate parcels and became a single tract of land. This is important because, as counsel for both sides recognize, actual possession of a part of the interlock is possession of the whole when the senior grantee has only constructive possession. 2 R. Minor, *The Law of Real Property* § 975 (F. Ribble 2d ed. 1928).

Before a junior grantee can acquire title by adverse possession, he must meet the following six requirements:

1. the possession must be hostile or adverse to the senior grantee;

2. he must have actual possession;

3. the possession must be visible and notorious;

4. the possession must be continuous;

5. possession must be under color of title; and

6. the possession must be exclusive.

Very little dispute exists between the parties that Johnson's possession was hostile, under color of title, and exclusive. Tobias' challenge to Johnson's claim of adverse possession focuses on the remaining three elements of adverse possession: actual, visible and notorious, and continuous possession.

### Actual Possession

█ Actual possession of the premises requires only that the junior grantee actually occupy the premises. *See* R. Minor, *supra*, § 969. The evidence clearly indicates that Johnson actually occupied the interlock. The undisputed evidence is that after Johnson, Sr., acquired the property in 1945, the Johnson family made extensive use of the house on a regular basis until the mid-to-late 1950's. In addition to the house, other indicia of occupancy exist, which is more fully discussed below. It seems to me that Tobias' challenge to the actual possession element goes more to the extent of the occupancy (i.e., whether it applies to the entire tract) and to the continuum of the occupancy. As stated above, actual occupancy of a portion of the interlock constitutes occupancy of the whole when the senior grantee has only constructive possession of the interlock. Thus, Johnson's occupancy of the house served to constitute his actual possession of the entire boundary commencing in 1945.

### Visible and Notorious

█ To meet this requirement, it is necessary that the junior grantee's occupancy "must be followed by acts of ownership, sufficiently pronounced and continuous in character to charge the owner with notice of the occupant's adverse claim ..." R. Minor, *supra*, § 963. It is further recognized "wild and uncultivated lands, remaining completely in a state of nature, cannot be the subject of adversary possession, while they remain completely in that state. A change in their condition, to some extent, is essential." *Id.* There is no question that the interlock was rugged, uncultivated, and by-and-large unimproved land. The question becomes, therefore, whether the interlock remained completely in a state of nature, or whether the changes wrought were sufficient to take it out of that classification.

In examining this problem, one would have to ask to what use the land was most readily adaptable, and to what extent must the occupant change such land to provide the necessary notice to the senior grantee.

From the testimony, it is quite obvious that Johnson put this land to the use for which it was most readily adaptable, i.e., outdoor recreational purposes. This being the case, one would not expect to see the boundary fenced, cultivated, or cleared. Probably the only feasible commercial activity would have been timbering. The evidence is that from 1945 forward, there was a house with a clearing around it, a road to the house, a driveway and, at one time, a cleared space for a garden adjacent to the house. Moreover, a road to the premiere location—McAfee's Knob—in the interlock, was maintained by Johnson. Access to the road and the Knob was controlled by a locked gate erected by Johnson, and "no trespassing" signs were posted and signed by him. Short of fencing the property, it is doubtful that Johnson could reasonably have done more to indicate his claim of ownership.

Were Johnson's acts sufficient to put Tobias on notice? Tobias was aware of Johnson's claim of ownership as early as 1958. He had seen the no trespassing signs and had been required to obtain a key from Johnson's agent to gain access to property that he (Tobias) claimed as his own property. Surely, this constitutes sufficient indicia that Johnson was claiming the same property that Tobias claimed. Subsequent to 1958, Johnson's occupancy and claim to ownership became even more visible. In 1960 Johnson granted an easement to APCO which, in turn, erected a large transmission line [2] across the interlock. Most assuredly, this was an act inconsistent with Tobias' ownership of which Tobias should have been aware.

### Continuity

Before the junior grantee can acquire title by adverse possession, it is necessary that, in addition to meeting all other requirements for adverse possession, the junior grantee actually possess the interlock continuously for a time period of fifteen years. Tobias' most serious challenge to Johnson's adverse possession claim concerns this requirement.

It is said "a break in the continuity of the possession may occur upon the occupant's *abandonment* of the premises, but the mere fact that the acts of possession are not continuous, day in and day out, or that there are cessations of actual occupancy, does not necessarily show an interruption of the possession, the consequences depending on the nature of the property and of the acts in question, and upon the circumstances of the particular case." R. Minor, *supra*, § 957 (emphasis in original). The evidence in this case shows that as of 1957, Johnson had vacated the house, and permitted it to fall into an extremely bad state of repair. Tobias points to this evidence as proof that Johnson abandoned the property and, therefore, broke the continuity of possession that defeats Johnson's adverse possession title claim. There are several weaknesses to this argument.

■ First, if Johnson had acquired title by adverse possession, through tacking his possession onto the possession of his predecessors-in-title, he would have acquired adverse title prior to 1957. Once title is acquired, it vests in the adverse possessor and a subsequent abandonment of the property does not defeat it. A second fallacy in Tobias' argument is that, as of 1958, Tobias was aware of Johnson's claim, he was aware of Johnson's control of the access road, and he was aware of the "no trespassing" signs. Moreover, as of 1961, Tobias should have been aware of the erection of the APCO transmission line. All of

---

**2.** Johnson asserts that the easement granted to APCO was tantamount to a lease, which Johnson claimed inured to his benefit and vicariously constituted occupancy by him. Tobias disputes this characterization of the easement and says that an easement is not equivalent to a lease, and in any event, if it were, the occupancy of a lessee is only to the extent of the boundaries of his leasehold interest and, therefore, APCO's occupancy of the easement would extend only to the twenty-foot strip granted in the easement. I need not decide these competing theories because I think the importance of the APCO easement lies not in whether APCO can occupy the land on behalf of Johnson, but in the fact that APCO constructed the transmission lines across the interlock which was a highly visible activity that should have put Tobias on notice to inquire as to the source of APCO's right to cross the land. In short, the erection of the transmission line is important in this decision only in its notice-giving characteristics.

these circumstances are outward tangible indicia of Johnson's claim to the property. Tobias, however, took no action to oust Johnson until he intervened in this lawsuit on September 23, 1985. Thus, assuming no per se requirement demands that Johnson maintain a dwelling on the interlock in order to actually possess it, one could count the twenty-four years from 1961, when APCO constructed its transmission line, to September, 1985 and determine that Johnson perfected his title by adverse possession.

■ None of the authorities with which I am familiar require a *dwelling* on the interlock to establish possession. The only requirement is that the occupant manifest his possession in visible, palpable ways that are consistent with his claim of ownership and inconsistent with the senior grantee's title. Granted that construction of a house and occupancy of it is one of the clearest acts that an adverse claimant can perform. Other acts, however, also can serve to put the senior grantee on notice. I think the evidence in this case demonstrates such other acts. With all the other indicia of claim which have been outlined above, Johnson's vacating the house does not show an intent to abandon the premises so as to break the continuity of the adverse possession.

In summary, the evidence shows that the Johnson family had actual possession of the interlock for a period of forty years. During this time, Johnson lived in and improved the dwelling on the premises; he maintained and reconstructed the road; he controlled access to the road; he posted no trespassing signs; and he granted an easement to APCO which constructed a highly visible power line. All of these acts were performed on the premises and were acts which were open and obvious and were sufficient to put Tobias on notice of Johnson's claim. In addition to the acts on the premises, Johnson did other acts which negate an intent to abandon the property. He paid taxes, hired deputies to patrol the property, and granted permission, both oral and written, to persons and groups who desired to use the property. Under these circumstances, it is my opinion that Johnson has proved, as a matter of law, adverse possession of the interlock and has title to it by reason thereof.