SEWELL PLASTICS, INC., Plaintiff,

v.

The COCA–COLA COMPANY (doing business through its division, Coca–Cola USA); Southeastern Container, Inc.; Aberdeen Coca–Cola Bottling Co., Inc.; Alabama Coca–Cola Bottling Company; Biscoe Coca–Cola Bottling Company, Inc.; Carolina Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company Consolidated; Coca–Cola Bottling Company of Anderson, South Carolina, Inc.; Coca–Cola Bottling Company of Asheville, N.C.; Coca–Cola Bottling Company of Mobile; Coca–Cola Bottling Company of Nashville, Inc.; Coca–Cola Bottling Company of Roanoke, Inc.; Coca–Cola Bottling Company of Wilson, Inc.; Coca–Cola Bottling Company United, Inc.; Coca–Cola Bottling Works of Tullahoma, Inc.; Columbia Coca–Cola Bottling Company; Columbus Coca–Cola Bottling Company; Dorchester Coca–Cola Bottling Company; Durham Coca–Cola Bottling Company, Inc.; Eastern Carolina Coca–Cola Bottling Company, Inc.; Fayetteville Coca–Cola Bottling Company; Hampton Bottling Works, Inc.; Lincolnton Coca–Cola Bottling Co., Inc.; Mid South Coca–Cola Bottling Company; Orangeburg Coca–Cola Bottling Co., Inc.; Plymouth Coca–Cola Bottling Co., Inc.; Rock Hill Coca–Cola Bottling Co.; Roddy Manufacturing Company; Sanford Coca–Cola Bottling Company; Tarboro Coca–Cola Bottling Company, Inc.; The Atlanta Coca–Cola Bottling Company; The Coastal Coca–Cola Bottling Company; The Coca–Cola Bottling Company of Henderson, Inc.; The Coca–Cola Bottling Company of Johnson City, Tennessee; and Wilmington Coca–Cola Bottling Works, Inc., Defendants.

No. C–C–86–363–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 25, 1989.

William L. Rikard, Jr., I. Faison Hicks, Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., Peter Aron, Alan T. Gallanty, Nancy Prahofer, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for plaintiff.

Ned A. Stiles, Golding, Crews, Meekins & Gordon, Charlotte, N.C., William M. Dreyer, Coca-Cola Co., Legal Div., Atlanta, Ga., for defendant Coca-Cola Co.

E. Osborne Ayscue, Jr., Norvin K. Dickerson, III, Smith, Helms, Mulliss & Moore, Charlotte, N.C., for defendant Southeastern Container, Inc.

Jonathan M. Jacobson, Carolyn T. Ellis, David A. Schwartz-Leeper, Coudert Brothers, New York City, for all other defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

TABLE OF CONTENTS

Page No.

I. SUMMARY OF DECISION .................................... 1198

II. PROCEDURAL HISTORY ................................... 1199

III. FINDINGS OF FACT ....................................... 1205
    A. "Introducing the Plastic Bottle:
       Sewell A Leading Supplier." ............................... 1206
    B. Formation of Other "Cooperatives" by Soft Drink Bottlers. ... 1207
    C. The Formation of Southeastern. ........................... 1208
       1. Southeastern's Supply Contracts........................ 1208
       2. Freight Equalization. ................................... 1209
       3. Southeastern's Price Competition Clause. ................ 1209
    D. Competition *Increased* After Southeastern Was Formed. ...... 1210
       1. Plastic Bottle Prices Decreased. ......................... 1210
       2. Production of Plastic Bottles Increased Substantially (More
          than Double). ...................................... 1211
       3. Market Concentration Has Decreased..................... 1211
       4. Retail Soft Drink Prices Have Decreased. ................. 1212
       5. Production Costs Have Decreased. ....................... 1212
       6. Spending for Research and Development Does Not Appear to
          Have Been Substantially Affected. ..................... 1212
       7. Quality and Service Have Not Substantially Changed. .... 1212
       8. Choice of Consumers as to the Kind of Bottle They Like To
          Buy Their Coke in Is Not Shown to be a Material Element
          in the Case. ........................................ 1212
       9. Defendants Do Not Have "Market Power." .............. 1212
      10. Effect on Competitors. .................................. 1212

IV. CONCLUSIONS OF LAW ..................................... 1215
    A. Reconsideration of Defendants' Motion for Summary Judgment. 1215
    B. The Standard for Summary Judgment........................ 1215
    C. Claims Under Sherman Act § 1. ............................ 1217
       1. *Per Se* Violations...................................... 1217
       2. Rule of Reason. ....................................... 1217
    D. Exclusive Dealing Claims. ................................. 1220
    E. Sewell's Other Claims. .................................... 1220
    F. *"Antitrust* Injury." ...................................... 1221

V. EPILOGUE ................................................ 1222

## I. SUMMARY OF DECISION

Plaintiff Sewell Plastics, Inc. ("Sewell") is a sizeable Delaware corporation headquartered in Atlanta, Georgia. Sewell is a wholly-owned subsidiary of Constar International, Inc., formerly known as The Dorsey Corporation. Sewell is the largest manufacturer of plastic soft drink bottles in the United States. Starting about 1977, Sewell was a pioneer in making plastic two-liter soft drink bottles from polyethylene terephthalate ("PET").

Defendant The Coca–Cola Company ("Coke") is a sizeable Delaware corporation also headquartered in Atlanta, Georgia. It sells syrups and concentrates to licensed bottlers. Its licensees sell soft drink products to consumers under the names "Coke" and "Coca–Cola" and other trademarks owned by The Coca–Cola Company. The Coca–Cola Company has ownership interests in certain bottlers, one of which is also a defendant.

Defendant Southeastern Container, Inc. ("Southeastern"), is a North Carolina corporation, owned by the defendant bottlers, which manufactures plastic soft drink bottles for sale to its owners. Although it is not organized as a cooperative association under North Carolina law, Southeastern fits the lay description of a "cooperative"; its officers and agents call it a "cooperative"; the complaint and several of plaintiff's documents (which are now defendants' exhibits) refer to Southeastern as a

"cooperative"; and the court will do likewise.

The remaining thirty-three defendants ("Bottlers") are bottlers licensed by The Coca–Cola Company to bottle and sell its soft drink products. They own and operate bottling facilities for Coke and other soft drink products in North and South Carolina, Georgia, Virginia, Tennessee, and Alabama. Under their agreements with The Coca–Cola Company, the Bottlers have exclusive sales territories.

By 1981, Sewell was supplying the defendant bottlers with over ninety percent of their plastic two-liter soft drink bottles. In 1981, those sales of soft drink bottles to defendants amounted to more than one hundred million bottles.

In 1982, the bottler defendants organized Southeastern to make plastic bottles for them and they started purchasing most of their plastic bottles from Southeastern. Thereafter, through 1986, they bought only about seventeen percent (23.8 million dollars worth) of their bottle requirements from Sewell.

Economic consequences in the relevant market of the bottle-making actions of defendants were dramatic.

Prices for plastic bottles dropped to about half what they had been when Sewell had the regional bottle manufacturing market mostly to itself.

Prices have remained low.

The number of competitors in the market has remained the same, but market concentration has decreased.

Some competitors have left the bottling business, and others have entered it.

Consumers benefit from lower bottle prices.

Production of plastic bottles has increased.

Production processes have continued to become more efficient.

Although some competitors may be making less profit, there has been no adverse effect on competition.

"The antitrust laws ... were enacted for 'the protection of *competition,* not *competitors,*'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)).

The court concludes that defendants are entitled to judgment as a matter of law and that the complaint should be dismissed.

## II.  PROCEDURAL HISTORY

Plaintiff filed the complaint on August 5, 1986. Docket No. 1. Sewell alleges that through continuing violations of federal antitrust laws and the North Carolina Unfair Trade Practices Act defendants have foreclosed Sewell "from effectively competing for a substantial portion of the market for the sale of [plastic beverage] bottles to soft drink bottlers within the southeastern United States." Complaint para. 1. Specifically, Sewell claims that defendants have conspired to form and have formed a combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982); have attempted to monopolize and have monopolized a line of commerce in a distinct geographic market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982); have engaged in an exclusive dealing arrangement in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14 (1982); have acquired stock with the effect of substantially lessening competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982 & Supp. V 1987); and have violated various provisions of the North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. §§ 75–1, 75–1.1, 75–5(b)(1, 2, 3, 7) (1988).

Sewell claims that the effect of defendants' alleged violations "has been to transform a once competitive marketplace into a non-competitive one, where competition in the sale of plastic beverage bottles to bottlers franchised by The Coca–Cola Company has been virtually eliminated." Complaint para. 3. Sewell claims damages in excess of $17 million, and seeks monetary and permanent injunctive relief.

On September 26, 1986, defendant Southeastern filed its answer. Docket No. 4. On September 29, 1986, defendant Coke filed its answer. Docket No. 5. On October 3, 1986, the Bottlers filed their answers. Docket Nos. 6–39. On May 7, 1987, the court allowed Southeastern to amend its answer, Docket No. 65, and Southeastern filed an amended answer asserting several counterclaims against Sewell. Docket No. 66.

Discovery commenced soon after the complaint was filed. The court set a discovery deadline of August 31, 1987, which, by and large, the parties met. Depositions of at least 100 persons were taken, and over three million pages of documents were produced by the parties and various nonparties. The parties left some discovery, mostly testimony of expert witnesses, to be scheduled as agreed after the deadline.

On September 29, 1987, defendants moved pursuant to Fed.R.Civ.P. 56 for summary judgment. Docket No. 95. On October 27, 1987, defendants filed a revised motion for summary judgment. Docket No. 102. On November 4, 1987, plaintiff filed its opposition to defendants' motion for summary judgment. Docket No. 102A.

On November 6, 1987, the court heard defendants' motion for summary judgment. At the hearing, defendants' counsel argued that on the basis of ten "undisputed" facts, the court should enter judgment for defendants as a matter of law. Docket No. 138 at 11–19 (Transcript of November 6, 1987, hearing). Plaintiff's counsel argued that most of the defendants' facts were sharply disputed, and started to present plaintiff's version of the "undisputed" facts. *Id.* at 23–47. Convinced that a swearing match among counsel would not produce a statement of truly undisputed facts, the court adjourned the hearing. In order to facilitate resolution of defendants' summary judgment motion, the court ordered the parties to reduce their contentions to writing and to serve them on the opposing parties pursuant to Fed.R.Civ.P. 36 as requests for admission. *Id.* at 47–53. At the end of the hearing, defendant Coke was permitted to file a separate motion for summary judgment, Docket No. 104, and that motion was incorporated in the process for admissions outlined by the court. *Id.* at 53–54.

On November 13, 1987, the court filed an order setting deadlines for serving requests for admissions and responding to those requests. Docket No. 108. The November 13 order also directed that, after the requests for admission were answered, defendants file a statement of undisputed facts in support of their motions for summary judgment and plaintiff file a statement of any facts which would warrant denial of defendants' motions.

On December 1, 1987, plaintiff moved pursuant to Fed.R.Civ.P. 12 and 56 that the court (a) declare the terms and conditions of the agreements between Southeastern and the Bottlers pursuant to which the Bottlers purchase bottles from Southeastern to be illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1; (b) declare the agreement among Southeastern and two other manufacturers of plastic beverage bottles to *purchase* PET resin jointly from resin suppliers to be illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1; (c) dismiss Southeastern's counterclaim; and (d) strike defendants' affirmative defenses based on the Soft Drink Interbrand Competition Act of 1980 and Coke's Sixth Affirmative Defense. Docket No. 109.

Defendants jointly served Sewell with 219 requests for admission; Coke separately served Sewell with 157 requests for admission; and Sewell served defendants with 311 requests for admission. When the dust settled in mid-February, 1988, the request for admissions process, intended to narrow and clarify the issues for decision, had instead bloated the record with the addition of a stack of paper over three feet thick. *See Sewell Plastics, Inc. v. The Coca–Cola Company,* 119 F.R.D. 24 (W.D. N.C.1988) (written and pictorial description of the summary judgment record).

On March 1, 1988, the court tried again. Observing that "[i]n the battle of manpower, the volume of paper which a modern law firm can produce is often greater than

a busy district judge can read and evaluate with care," the court ordered the plaintiff and each group of defendants to file "a statement of *undisputed material* facts either expressly *admitted* or *sworn to and undisputed on the record*, not exceeding ten (10) pages." *Id.* at 25–26. In addition, the court ordered counsel to "meet and make a serious effort to agree on *and sign a written agreement* on the facts necessary to decide the summary judgment motions." *Id.* at 26. In response to the March 1 order, plaintiff and each group of defendants filed a statement of facts. Docket Nos. 139–42. The parties filed a stipulation. Docket No. 143. Plaintiff filed an outline in opposition to defendants' statements of "purportedly undisputed" facts. Docket No. 144.

On April 18, 1988, the court heard: (1) defendants' motion for summary judgment; (2) Coke's separate motion for summary judgment; and (3) plaintiff's motion for declaration of *per se* illegality. At the hearing, defendants' counsel argued that "whether Sewell had shown an adverse effect on competition is a dispositive point." Docket No. 150 at 20 (Transcript of April 18, 1988, hearing). Defendants' counsel pointed out that Sewell had: (1) stipulated that "Southeastern's prices have decreased from $220 a thousand for 2–liter bottles to $146"; (2) admitted that "plastic beverage bottle prices in general have decreased since 1982 when Southeastern was formed"; (3) stipulated that "output of plastic bottles sold to the bottler Defendants has increased every year"; (4) supplied a witness who testified that "output of plastic bottles in the market as a whole has increased since 1982"; and (5) stipulated that the "number of competitors in the Southeast area, which is the market alleged by Sewell, has not declined since Southeastern was formed." *Id.* at 21–22. Defendants' counsel urged the court "to focus on whether the challenged activity has the actual or probable effect of decreasing market output or increasing market prices." *Id.* at 20.

During the April 18, 1988, hearing, plaintiff's counsel did not dispute the above facts as set forth by defendants. Instead, plaintiff assumed the correctness of those facts and argued that: (1) "[e]very fact is consistent with a buyer price-fixing conspiracy, so there is no way you have these facts could [sic] a Defendant be entitled to judgment as a matter of law"; and (2) "these facts are equally consistent with a growing marketplace and a lot of competitiveness that have nothing to do with the activities in question." *Id.* at 31. When pressed by the court to describe the adverse effects of defendants' conduct *on competition*, plaintiff's counsel stated that "the principal adverse effect is that the business of the bottler Defendants, of approximately 33 or so bottlers all located in the same geographic area, is not open for competition from Sewell or for anyone else...." *Id.* at 37.

At the end of the April 18, 1988, hearing, the court denied plaintiff's motion for summary judgment on Southeastern's counterclaim and motion to strike Coke's sixth affirmative defense. The court took the remaining motions under advisement. *Id.* at 96.

Given the apparent procompetitive benefits arising from the formation and operation of Southeastern, the court concluded that defendants' activities were not illegal *per se* under the Sherman Act. Although the data on price and output were damning to plaintiff's case, the court rejected defendants' attempt to limit consideration of anticompetitive effects to price and output as too narrow. Although plaintiff had not set forth any specific facts demonstrating an adverse impact on competition, the court at that time was willing to assume that plaintiff had produced at least a scintilla of evidence on the subject in a stack of papers over three feet high. Also, believing that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the court concluded that plaintiff's claims could be a tried to a jury under the rule of reason.

Consistent with its then thinking, the court filed a twenty-page order on May 6,

1988, 720 F.Supp. 1186, which: (1) granted summary judgment to defendants on the question whether their activities were illegal *per se* as a group boycott or price-fixing; (2) denied defendants' motion for summary judgment in all other respects; (3) denied Coke's separate motion for summary judgment; and (4) denied plaintiff's motion for declaration of *per se* illegality. Docket No. 146. Approximately nineteen of the twenty pages were devoted to the question of *per se* illegality. Quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979), the court held that any restraints on competition arising out of the formation and operation of Southeastern were not on their face "plainly anticompetitive and without redeeming value." Docket No. 146 at 15, 19. The remaining one page of text rejected defendants' argument that anti-competitive effects are limited to raising prices or reducing output, and without further discussion held that plaintiff's evidence was sufficient to raise issues of material fact for trial under the Rule of Reason as to the anti-competitive effects of the restraints arising out of the formation and operation of Southeastern. *See id.* at 16–17, 20.

On May 11, 1988, defendants moved that the court amend the May 6, 1988, order to include findings necessary to certify two questions for immediate appeal pursuant to 28 U.S.C. § 1292(b). Docket No. 147. On May 12, 1988, defendant Coke moved that the court reconsider denial of its separate motion for summary judgment or, alternatively, certify the denial of Coke's motion for summary judgment for immediate appeal pursuant to 28 U.S.C. § 1292(b). Docket No. 148.

On July 27, 1988, the court amended the May 6, 1988, order to include specific factual findings about Coke's role in the formation and operation of Southeastern. Docket No. 152. Also, on July 27, 1988, the court, uncertain that its assumption about the record was correct, certified two questions for immediate appeal pursuant to 28 U.S.C. § 1292(b):

1. Is plaintiff's evidence of an adverse effect on competition legally sufficient to raise a genuine issue of fact as to whether defendants have violated Sections 1 or 2 of the Sherman Act, or Sections 3 or 7 of the Clayton Act, or N.C.Gen.Stat. §§ 75–1, 75–1.1, 75–5(b) (1,2,3,7)?

2. To establish a violation of the antitrust laws, in a case in which the "Rule of Reason" applies, must a plaintiff show some actual or probable adverse effect on price or output?

Docket No. 153. The July 27 order certifying the questions for appeal also provided that this action would be stayed if the Fourth Circuit Court of Appeals granted defendants permission to pursue the discretionary appeal.

On September 6, 1988, the United States Court of Appeals for the Fourth Circuit denied defendants' petition for leave to take an interlocutory appeal. Docket No. 163.

On November 3, 1988, the court held a status conference and ordered: (1) that all motions by the parties be filed not later than January 16, 1989; (2) that jury selection take place on March 23, 1989; and (3) that the clerk calendar this action for trial in a six-week jury term beginning on March 28, 1989. Docket No. 172.

The clerk calendared all pending motions for hearing on March 1, 1989. In preparing to hear those motions, the court was again required to scrutinize plaintiff's theory of the case and the sufficiency of its evidence. Still concerned about the assumption that plaintiff had produced or could produce evidence demonstrating an adverse effect on competition, the court considered asking for reargument of defendants' motion for summary judgment at the March 1, 1989, hearing. Also, a letter from defendants' counsel dated February 16, 1989, urged the court to reconsider the May 6, 1988, order. Ultimately, the court decided against asking for reargument at that time.

The court heard the motions on March 1, 1989, and on March 3, 1989, filed an order ruling on the motions. Docket No. 196.

Over the next few weeks, as the time for selecting the jury drew near, the court

became increasingly concerned over the lack of evidence to support plaintiff's claims. Finally, on March 21, 1989, thinking that "after a long period of sweating over this case it was not unfair to ask the plaintiff again to show [the court] the color of his money," Docket No. 205 at 7 (Transcript of March 22, 1989, hearing), the court ordered that the summary judgment motions be reargued on March 22, 1989. Docket No. 198. Upon obtaining a copy of the order later in the day on March 21, 1989, plaintiff inquired of the court and was informed that the focus of the reargument would be defendants' motion for summary judgment. Docket No. 203.

On Wednesday, March 22, 1989, the court again heard defendants' motion for summary judgment. At the hearing, the court first addressed plaintiff's motion that the court vacate the March 21, 1989, order and postpone the commencement of the trial for 48 hours or, in the alternative, continue the trial and postpone the rehearing on the motion for summary judgment for at least ten days. *Id.* In support of the motion, plaintiff's counsel argued that "it is sort of hard to all of sudden reorient yourself back to a Summary Judgment mode from what you were trying to do to put together the efficient, effective presentation of your case." Docket No. 205 at 3. The following dialogue ensued.

> COURT: What do you intend to say to the jury in your opening statement that you don't know now?
>
> PLAINTIFF'S COUNSEL: I don't know—I mean, I think we know what we are going to say to the jury.
>
> .    .    .    .    .
>
> COURT: If you were making an opening statement to the jury this morning, would it not be necessary, in order not to run the risk of being dismissed on your opening statement, that you recite to the jury the evidence which you say will support your—
>
> PLAINTIFF'S COUNSEL: Yes, sir, and we are prepared to do that.
>
> COURT: That's what I want to hear from you today.

> PLAINTIFF'S COUNSEL: We can do that....

Docket No. 205 at 4–5.

Plaintiff had one other problem with rearguing defendants' motion for summary judgment. Without conceding (or even suggesting) that the record as of May 6, 1988, was inadequate to support the court's initial decision that plaintiff's claims presented a genuine issue for trial, plaintiff in its motion pointed out that, since the partial denial of defendants' motion for summary judgment, it had amassed "additional" evidence in support of its claims which was not in the record. Docket No. 203 at 5. Addressing this concern, the court stated that it was not "asking that any evidence be put in the record." Docket No. 205 at 6. Instead, the court emphasized that it simply wanted to be directed to evidence in the already voluminous record which would justify submitting plaintiff's case to the jury. *Id.* The court specifically stated that it would be content to hear "an argument from each side on the Summary Judgment Motion on the state of the record, as it now stands." *Id.* at 8. However, the court pointed out that if plaintiff intended to rely on its "additional" evidence in order to overcome defendants' motion for summary judgment, Fed.R.Civ.P. 56 required plaintiff to produce the "additional" evidence to the court in the form of "specific facts showing that there is a genuine issue for trial." *See* Docket No. 205 at 18–20.

The focus of reargument was the effect of defendants' activities on competition in the relevant market. *Id.* at 14. During the hearing the court asked questions regarding the price of plastic bottles; output of plastic bottles; evidence of predatory pricing by Southeastern; whether Southeastern's activities had forced any competitors out of the market; and whether there were other competitors in or seeking to enter the market. *Id.* at 14–15, 30–31, 33, 36. In attempting to address those questions, plaintiff's counsel was not able to cite the court to any specific portions of the existing record. Instead, plaintiff's counsel summarized evidence *not* in the record and asserted that "[w]e can produce the

documents we are going to rely on." *Id.* at 20. (Defendants, on the other hand, tendered the final report of their economist (the preliminary version of which was filed on September 12, 1988, Docket No. 166), which corroborated and elaborated on the trends regarding prices, output and the number of competitors in the market stated by defendants' counsel at the April 18, 1988, hearing. *Id.* at 32.)

At the end of the hearing, the court concluded that it had not "heard information that justifies denying the Motion for Summary Judgment." *Id.* at 44. However, since the court has for years avoided summary judgment, and had not heard and seen all of plaintiff's evidence, the court denied defendants' motion for summary judgment without prejudice to renewal and ordered that jury selection and trial go forward as scheduled. *Id.* at 44–45. The court noted that it intended to "listen to the opening statements because I will need more clarification than I have on exactly what happened." *Id.* at 46.

On Thursday, March 23, 1989, a jury was selected and empanelled. After jury selection, defendants renewed their motion for summary judgment. Docket No. 218 at 134 (Trial Transcript, March 23, 1989). In response to the renewed motion, plaintiff argued that it would offer evidence at trial of at least 18 kinds of anticompetitive effects. *Id.* at 138. For the first time, plaintiff asserted that there would be some evidence of predatory pricing by defendants. *Id.* When defendants' counsel pointed out that they had never heard allegations of predatory pricing previously, plaintiff's counsel responded by stating that "there was no occasion to tell them." *Id.* Without entertaining extended argument, the court noted that it was "still waiting for the evidence which would support a recovery," and suggested that "if [plaintiff has] evidence which will rebut a Summary Judgment Motion, the time for me to see it is Monday and Tuesday." *Id.* at 140–41. In response, plaintiff's counsel asserted that they could present some of their evidence if the court would give them 30 minutes. *Id.* at 141. However, when the court offered to remain available for thirty minutes while

counsel gathered the evidence, plaintiff's counsel instead promised "to submit something to [the court] in writing Tuesday morning [the first day of trial]." *Id.* at 142.

On Tuesday, March 28, 1989, the trial began with counsel making opening statements to the jury. Consistent with the theory stated in the complaint, plaintiff's counsel argued that "[w]hat this case is about is that [*the Bottlers*] set [Southeastern] up in a way so that no one ... any longer could compete for the business of *those bottlers.*" Docket No. 219 at 157 (Trial Transcript, March 28, 1989) (emphasis added). Plaintiff's counsel argued that the "anticompetitive" effects of Southeastern's formation and operation had been "severe": (1) Some "healthy" suppliers had gone out of business; (2) Southeastern had at times experienced quality problems with its bottles; and (3) Consumers of soft drinks had been unable to purchase Coke products in the plastic bottle they preferred. *Id.* at 163, 166–67.

After opening statements, defendants again renewed their motion for summary judgment. *Id.* at 211. Defendants argued that "[n]othing in the Plaintiff's opening statement indicated that proof will be forthcoming of an adverse effect on competition." *Id.* Plaintiff's counsel again argued that evidence of lower prices, put forth by defendants' in their opening statements, was a form of competitive injury consistent with a buyer price fixing conspiracy. *Id.* at 213. After taking the motion under advisement during the luncheon recess, the court concluded that "I had better vote my conscience on the merits now, instead of going through [a trial] first." *Id.* at 231. The court announced its intention to grant defendants' motion for summary judgment, requested that defendants propose findings of fact in accord with the ruling and asked that plaintiff respond to defendants' proposals. *Id.*

*After* the court announced its decision, plaintiff's counsel stated, "[W]e did have in preparation responses to the questions you asked last Wednesday [March 22], and we do have them ready to file, and would like

to offer them to the Court ... as part of the record." *Id.* at 234. Plaintiff then, *after* the decision had been announced, filed what it considered to be its response to the court's questions concerning injury to competition and three volumes of a four volume appendix to its response. Docket Nos. 208–11. On March 31, 1989, plaintiff again filed its response and the complete four volume appendix. Docket Nos. 212–16. [These submissions are duplicative.]

On April 4, 1989, defendants filed four volumes of evidentiary material in response to plaintiff's March 31, 1989, submissions. Docket Nos. 220–23. On April 5, 1989, defendants filed proposed findings of fact and conclusions of law, twenty-nine pages long, with a one volume evidentiary appendix. Docket No. 224–25. On April 12, 1989, plaintiff filed (1) 210–page response to defendants' proposed findings, (2) one volume of exhibits to its response and (3) a *seven* volume appendix to its response. Docket Nos. 234–42. On April 24, 1989, plaintiff filed an *eight* volume appendix of "additional documents and transcript excerpts previously cited in the record." Docket Nos. 251A–H. On May 5, 1989, defendant Coke filed additional evidentiary materials. Docket Nos. 256–58. Thus, all in all, *after* the court's announced decision to grant defendants' motion for summary judgment, a total of over five feet of paper was filed with the court!

### III. FINDINGS OF FACT

As the Supreme Court has noted, Fed.R. Civ.P. 56 does not require the trial judge to make findings of fact; however, in many cases, "findings are extremely helpful to a reviewing court." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 & n. 6, 106 S.Ct. 2505, 2511 & n. 6, 91 L.Ed.2d 202 (1986). By relying almost exclusively on quotations from the complaint, on admissions and stipulations, and on Sewell's own internal documents, the court has tried to cut through what is now an approximately thirteen-foot thick record and produce a statement of material facts which are either undisputed or, where a question is disputed, viewed in the light most favorable to plaintiff.

The "substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. at 2510. Thus, in setting forth the facts below, the court will be guided by what the Supreme Court has referred to as "the classic statement of the rule of reason." *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343 n. 13, 102 S.Ct. 2466, 2472, n. 13, 73 L.Ed.2d 48 (1982).

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court interpret facts and to predict consequences.

*Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (Brandeis, J.).

For purposes of deciding defendants' motion for summary judgment, the court has adopted plaintiff's definition of the relevant market. The *product* market is plastic beverage bottles of all sizes, 16–ounce/half–liter, one-liter, two-liter and three-liter. The *geographic* market is what plaintiff refers to as the "Southeast area": North Carolina; South Carolina; Georgia; Southeastern Virginia, including Roanoke and Lynchburg; Northern Alabama, including Birmingham and Tuscaloosa; and Eastern Tennessee, including Nashville. PTX 14,107.

The court will use the following short forms of citation in the findings and conclusions: (1) Sewell's answers to defendants' joint requests for admission, Docket No.

135, filed March 2, 1988, will be referred to as "Sewell Adm."; (2) Sewell's answers to Coke's separate requests for admission, Docket No. 134, filed March 2, 1988, will be referred to as "Sewell Coke Adm."; (3) defendants' answers to Sewell's requests for admission (dated December 18, 1987), Docket No. 250, filed April 24, 1989, will be referred to as "Defendants Adm."; (4) the stipulation of facts by the parties, Docket No. 143, filed March 21, 1988, will be referred to as "Stip. A"; (5) documents marked by plaintiff as exhibits for trial will be referred to as "PTX"; (6) documents marked by defendants for trial will be referred to as "DTX"; and (7) plaintiff's response to defendants' proposed findings of fact and conclusions of law, Docket No. 234, filed April 12, 1989, will be referred to as "Plaintiff's Response."

Finally, in calling for reargument of the summary judgment motions, the court was content with the already voluminous record. However, the court naturally wanted to see any additional evidence developed by plaintiff in support of its claims, especially if that evidence was necessary to overcome defendants' motion. As of Wednesday, March 22, plaintiff was aware of the court's concerns about whether a trial was warranted. Plaintiff failed to file any evidence in response to the questions about the impact of defendants' activities on competition until *after the court, on March 28, 1989, announced its intention to grant defendants' summary judgment motion.* Fed.R.Civ.P. 56(c) requires the court to decide summary judgment motions on the basis of evidence "on file." Although plaintiff had failed to file or otherwise come forward with additional evidence *in a timely manner,* the court felt that it ought to consider everything that had been filed since, as well as before, the time the court announced its decision. Therefore, the court has considered all the materials submitted by plaintiff after March 28, 1989, although most of it is irrelevant to the summary judgment motion and much of it would be inadmissible at trial. That evidence does not change the merits of the case.

A. "Introducing the Plastic Bottle: Sewell A Leading Supplier." [1]

"As of 1977, packaged carbonated soft drinks in this country were sold in containers made of glass, aluminum or steel. In or about 1977, Sewell, among others, began manufacturing plastic soft drink bottles made of PET material. During the late 1970's, Sewell became a leading manufacturer of plastic beverage bottles, which readily gained popularity with bottlers and consumers." Complaint para. 11. Sewell was the first supplier of the two liter plastic beverage bottle to a Coca–Cola bottler, supplying the Spartanburg, South Carolina, bottler in August 1977. PTX 6. Dorsey's 1978 Annual Report referred to Sewell as the "dominant supplier of the PET 2 liter soft drink package in its marketplace." DTX 2 at 3.

"[C]hoice of plant location has been an important competitive element in the [plastic bottle] industry: nearness to the customer [is] an advantage, as it [makes] service easier and [results] in lower freight charges." Complaint para. 13. "Sewell's ability to set up plant in locations where Sewell would be well-positioned to supply surrounding bottlers contributed to Sewell's success." Plaintiff's response, Tab 1 at 29.

"Prior to October 1980, Sewell was the only company with a plant for manufacturing plastic beverage bottles physically located in North Carolina, South Carolina, or Virginia that was authorized to supply bottlers of Coca–Cola. (Sewell had no Virginia plant.) As of October 1980, however, there were other suppliers with manufacturing plants located outside North Carolina, South Carolina, and Virginia that were authorized to supply plastic beverage bottles to Coca–Cola bottlers, including bottlers located within those states; and in October 1980, Coca–Cola USA authorized Incon's Columbia, SC, plant to supply plastic beverage bottles to bottlers of Coca–Cola. By 1981, Incon's plant in Clinton, NC, was authorized to supply bottlers of

---

1. This is the heading used by plaintiff in the    Complaint. Docket No. 1 at 16.

Coca–Cola. According to invoices produced by the bottler defendants, in 1981, with the exception of 15,984 two-liter bottles shipped by Owens–Illinois to Columbia Coke in May 1981, the only purchases of plastic bottles by bottler defendants located in North Carolina, South Carolina or Virginia were from Sewell or Incon." Stip. A para. 15.

By 1981, Sewell was the leading supplier in the Southeast area market, producing and selling just over 50% of the plastic bottles in the Southeast area. *See* Section III.D.3, *infra.* Sewell also was the leading supplier for the defendant Bottlers. "Based on bottler defendant records produced in this litigation, during calendar year 1981, Sewell sold more than 90% of the two-liter and half-liter plastic beverage bottles purchased by the bottler defendants in the aggregate." Stip. A para. 5. The complaint alleges and the data compiled by the parties confirms that Sewell's sales to the defendant Bottlers in 1981 were over 100 million bottles. Complaint para. 14; Docket No. 216, Tab 36 (plaintiff's data); DTX 301, Table 8.A.3.

In 1978 Sewell's two-liter "bare bottle" list price (*i.e.,* excluding labels and cartons) was $242.67 per thousand, plus delivery. Sewell Adm. 1.6. Sewell increased its list prices for two-liter plastic beverage bottles every year from 1978 to 1981. Sewell Adm. 1.7. By August, 1981, the bare bottle list price had increased to $320.33 per thousand, plus delivery. Sewell Adm. 1.8. It is undisputed that not all of Sewell's sales were at list prices, and by 1981, most were not. Plaintiff's response, Tab 1 at 30. For example, in November, 1980, Sewell's list price for unlabeled two liter bottles in a 6 pack 200 # test HSC carton with H-divider was $332.65 per thousand, (reflecting Sewell's bare bottle price of $292.33). DTX 574 (price list effective September 15,

1980). However, according to a Sewell internal memorandum dated November 24, 1980, a price range from $275 to $285 per thousand for two liter bottles in a 6 pack of 200# test HSC carton with H-divider was "representative of Eastern markets." DTX 612. Nevertheless, in November, 1980, several of the defendant Bottlers *were* paying Sewell's *list* prices.[2] DTX 614; DTX 608; Sewell Adm. 1.10.

In 1977, Sewell earned net profits of $3,867,000. Sewell Adm. 1.11. In 1980, Sewell earned net profits of $35,689,000, an 823% increase over 1977. Sewell Adm. 1.12. In 1980, Sewell's return on net operating assets was 42.2%.[3] Sewell Adm. 1.13. Sewell's profitability in 1980 was at least partly due to the fact that without major regional competition its prices remained well above its manufacturing costs. For example, while prices in November, 1980, were within the $275–$332 range discussed *supra,* Sewell's true two liter *manufacturing* cost was only $210. DTX 612.

Plaintiff argues that by 1980 the number of merchant suppliers had increased and, as a result of an oversupply of this product, merchant suppliers in the Southeast area engaged in substantial price competition. Plaintiff's response, Tab 1 at 31, 37. In support of this argument, plaintiff has submitted hundreds of "Competitive Price Requests" dated from July, 1979, to October, 1982. PTX 16,000–16,684. Although the evidence was not part of the summary judgment record as of March 28, 1989, what it shows is that there was substantial price competition in the Southeast area beginning in approximately 1980 which often caused Sewell to sell plastic bottles at prices *lower* than its list prices.

B. Formation of Other "Cooperatives" By Soft Drink Bottlers.

"South Atlantic Canners (SAC) is a corporation (sometimes called a 'canning coop-

---

**2.** Unlike antitrust law in general and this suit in particular, the plastic bottle industry is not lacking in sex appeal. A Sewell inter-department memorandum states that:

> It has now been approximately six weeks since Incon was approved to supply Coca–Cola Bottlers. Their pricing has been somewhat *erotic* [sic] with both labeled and unla-

beled bottles in a 6/1 200# H-divider box being quoted at $315.00/m.
DTX 614 (November 25, 1980).

**3.** Plaintiff now disputes this fact, which it had previously admitted without qualification in answering a request for admission. Plaintiff's response, Tab 1 at 38.

erative') formed in or about 1975 by a group of Coca–Cola bottlers in or about the Southeast area. Several of the bottler defendants are, or have been, members of SAC." Stip A. para. 11. SAC was formed "for the purpose of owning and operating an expensive, high-speed metal can filling line," because "[n]one of its members then sold or now sell a sufficient number of filled metal cans to support the expense of buying and operating a can filling line." Mizell Aff., September 24, 1987, at para. 2. By September 1987, there were eleven canning "cooperatives" operating in the Coca–Cola system. Woodlee Aff., September 14, 1987, at para. 5.

Starting in or about 1980, before the formation of Southeastern, manufacturers of plastic bottle manufacturing equipment began encouraging bottlers to consider self-manufacture of plastic bottles. Sewell Coke Adm. 18.3. Pepsi–Cola bottlers such as the Pepsi bottler in Cranston, Rhode Island, and Carolina Packaging, the Pepsi plastic bottle manufacturing "cooperative" in Cheraw, South Carolina, began manufacturing plastic bottles for their use before any Coca–Cola bottlers did. Sewell Coke Adm. 15.3. Carolina Packaging was formed in late 1978 by Carolina Canners, Inc., a Pepsi canning "cooperative." Mizell Aff., September 24, 1987, at para. 6. In 1979, Western Container, a plastic bottle manufacturing "cooperative" was formed in Big Spring, Texas, by Coca–Cola bottlers; several of these bottlers were members of Southwest Canners, a Coca–Cola bottler canning "cooperative." Sewell Adm. 3.9. In late 1981 and early 1982, members of Gulf States Canners, another Coca–Cola bottler canning "cooperative," formed a "cooperative" to manufacture plastic bottles at Gulf States' plant in Clinton, Mississippi. Sewell Adm. 3.10.

C. The Formation of Southeastern.

According to plaintiff's internal memoranda, in May and June, 1981, before the formation of Southeastern, representatives of South Atlantic Canners told Sewell that they wanted to discuss a self-manufacturing arrangement and/or group purchasing through a buying co-op in order to reduce packaging costs and better compete with Carolina Canners. DTX 678; DTX 706.

In 1981, the bottler members of SAC decided to pursue the possibility of forming a plastic bottle manufacturing "cooperative" in order to produce bottles for themselves. DTX 1061. They formed Southeastern Container in 1982. The plant was constructed in Enka, North Carolina, that year and Southeastern began shipping bottles in October, 1982. *Id.*

Southeastern sells plastic bottles to its owner-members. Southeastern does not supply containers to Pepsi or Royal Crown bottlers, or to purchasers of non-beverage containers. Sewell Adm. 17.1. Furthermore, "Southeastern does not sell to non-member [Coke] bottlers nor does it allow its members to re-sell empty bottles to non-member bottlers." Plaintiff's response, Tab 1 at 101 (citing PTX 2307; PTX 3339); Defendants Adm. 208.

Plaintiff challenges several aspects of Southeastern's formation and operation as violative of federal antitrust law.

1. Southeastern's Supply Contracts.

The parties agree that a plastic beverage bottle production plant requires some minimum amount of volume to justify the investment in plant and equipment. Plaintiff's response, Tab 1 at 56. The parties dispute what minimum amount was necessary in 1982 to make self-manufacture economically viable and whether any one of the Bottlers could have engaged in self-manufacture alone. However, in deciding defendants' motion for summary judgment, this dispute is not material.

When Southeastern was formed in 1982, the stockholders invested $1.2 million of equity and guaranteed $6 million of debt. DTX 937, Exh. I. All of Southeastern's members signed supply contracts under which they agreed to purchase 80% of their two-liter plastic bottle requirements for five years. Defendants Adm. 46. After the initial five-year period, the supply contracts allow cancellation "at any time by providing sixty (60) days written notice...." *E.g.*, PTX 10,117. Some of the Bottlers signed the supply contracts before

Southeastern was capable of making and delivering bottles. Defendants Adm. 49.

Long-term supply contracts for such a significant portion of a bottler's requirements were common in the plastic bottle market prior to the formation of Southeastern. Between 1977 and 1981, the majority of Sewell's plastic beverage bottles were sold pursuant to three-year and/or five-year supply contracts with its customers. Sewell Adm. 7.5. Between 1978 and 1982, Sewell entered into five-year supply contracts with more than 50 of its customers. Sewell Adm. 7.4. Amoco, Owens–Illinois, Hoover and Continental also have used three-year and/or five-year plastic beverage bottle supply contracts. Sewell Adm. 7.16. Plaintiff does not dispute that Western Container's members entered into supply contracts with Western under which they agreed to purchase at least 80% of their two-liter plastic bottle requirements for ten years and that Southeastern used those contracts as models for its supply contracts. Plaintiff's response, Tab 1 at 78.

Sewell complains of efforts made by Southeastern to hold its members to their contractual agreement to purchase 80% of their requirements of certain types of bottles from Southeastern. There is evidence that in 1984, Southeastern *considered* imposing penalties on Asheville Coke and Coke United if they failed to comply with their supply contracts with Southeastern. Nash dep. at 369–71; Perry dep. at 485–93.

Plaintiff also contends that Anderson Coke was threatened with a $2,000 per truckload penalty if they purchased bottles from other suppliers. Plaintiff's response, Tab 1 at 95 (citing PTX 1044; PTX 1020; Marchant dep. at 37–38, 57; Dunagan dep. at 495–97). The evidence cited by plaintiff does not state or suggest that Anderson Coke was "threatened" with a penalty in the amount of $2,000 (or any other amount) per truckload. The only reference to $2,000 appears in PTX 1020, a letter dated January 24, 1983, from Edward T. Mizell, President of Southeastern, to Walter Bratcher of Anderson Coke, which in pertinent part reads as follows:

[E]ach load that Member Bottlers purchase from someone other than Southeastern, costs the project approximately $2,000. Therefore, we need every member's full support and participation, if we are to continue to progress and do the job for which this project was established.

The court declines to find that discussion of liquidated damages or of requesting a stated sum for violation of an otherwise lawful contract is a violation of the antitrust law or unfair trade practice law. There is, in fact, an obligation under the law to abide by lawful contracts even though those contracts may later be viewed by the accountants as unprofitable and by the executive officers as uncomfortable. Moreover, Southeastern's board of directors had a fiduciary obligation to enforce the supply contracts. A demand that an otherwise lawful contract be respected and complied with does not convert the contract into an unlawful agreement.

2. Freight Equalization.

Southeastern's member bottlers (within a 300–mile radius of Asheville, North Carolina) pay the same price for bottles purchased from Southeastern, including delivery. Defendants Adm. 57. The use of a delivered price equalizes the freight costs among the Bottlers, "so that no owner-bottler would enjoy a lower transportation cost by reason of its geographic proximity to Southeastern." Docket No. 146 at 7 (May 6, 1988, order). A Sewell competitive information report, dated October 31, 1985, states that Carolina Packaging quoted delivered prices to its members in a mailing on October 23, 1985, and that "[f]reight costs are divided equally among the membership." DTX 1787.

3. Southeastern's Price Competition Clause.

The Bottlers were obligated to accept Southeastern's set price for the first year of their supply contract. After the first year, a member-bottler could purchase any percentage of its requirements elsewhere if it proved that two other suppliers offered lower prices over a six month period and Southeastern was unable to meet the aver-

age of the two lower prices within sixty days. *E.g.*, PTX 10,117. Sewell's contracts normally required it to meet a lower price by a "reputable supplier" or allow the bottler to purchase elsewhere. However, by 1981, Sewell's contracts began to exclude "inplant production, bottle co-op organization and self-manufacturing" from their definition of "reputable supplier." *E.g.*, DTX 3272 at 3.

There is ample evidence from Sewell's internal documents that it considered and pursued a strategy of offering pricing concessions to certain of the defendant Bottlers in order to make the "investment of self-manufacture unattractive" and prevent "South Atlantic Canners from obtaining the necessary volume to support machinery." DTX 816. *See also* DTX 790; DTX 865.

**D. Competition *Increased* After Southeastern Was Formed.**

**1. *Plastic Bottle Prices Decreased.***

Southeastern's computer records reflect the following invoice prices for two-liter bottles (per thousand, delivered) to its member-bottlers from 1982 through 1986:

| | |
|---|---|
| October 1982 | $220 |
| March 1983 | $210 |
| April 1983 | $205 |
| June 1983 | $195 |
| September 1983 | $190 |
| April 1984 | $170 |
| January 1985 | $166 |
| May 1985 | $156 |
| May 1986 | $146 |

Stipulation A, para. 1. Southeastern's invoice prices are subject to year-end adjustments. Southeastern's computer records reflect that Southeastern has never increased invoice prices (which are subject to year-end adjustment) in its history. *Id.*

It is undisputed that: (1) Sewell's prices in the Southeast area for two-liter bottles have declined from 1982 through 1986; (2) Sewell's prices for three-liter and 16–ounce bottles have declined through 1986; and (3) prices of other suppliers in the market also have declined. Plaintiff's response, Tab 1 at 90–91. For example, Sewell's average bare bottle price to customers of its three plants in the Southeast area for two liter bottles (per thousand) was $198.41 in 1984,

$184.76 in 1985, and $173.39 in 1986. *See* PTX 14,001A (calculated from plaintiff's data submitted after March 28, 1989, by summing revenues from all plants and dividing by total unit sales). *See also* DTX 301, Table 4.4 (virtually identical calculation of Sewell's two liter bare bottle price from 1984 to 1986).

There is no evidence in the original summary judgment record of below cost pricing by Southeastern. Sewell's only *allegation* of below cost pricing, advanced for the first time *after* jury selection on March 23, 1989 (*see* Docket No. 218 at 138–39), involves the sale of certain three-liter bottles by Southeastern in 1985. It is undisputed that Southeastern began manufacturing three-liter bottles in January, 1985. Plaintiff's response, Tab 1 at 119. Without regard to the reasonableness of the projection, it is also undisputed that Southeastern had projected three-liter sales of 43 million bottles in 1985 at a projected average total cost of $187 per thousand. *Id.;* DTX 4007. At the end of February, 1985, sales of three-liter bottles were well below the projection, total cost was $205 per thousand and Southeastern's total costs for three-liter bottles exceeded total revenues by $105,000. DTX 4008. However, in March, 1985, revenues exceeded total three-liter costs (PTX 3124), and from March through December 1985, three-liter revenues exceeded costs by $70,000, leaving a 1985 year-end deficit of only $35,000. DTX 4007. In 1986, three-liter revenues exceeded total costs by $315,000. PTX 4263. There is no evidence that the sales in January and February, 1985, were made below Southeastern's incremental or variable costs. Nor is there evidence that the costs associated with production of three-liter bottles impaired Southeastern's profitability on its three product lines as a whole; in 1985, Southeastern had overall pre-tax earnings of $900,000. PTX 3415 at Exhibit B.

Plaintiff contends that from 1982 through 1986, PET resin prices were a factor in declining plastic bottle prices. Plaintiff's response, Tab 1 at 91, 93 (citing PTX 14,120 (Sewell's resin costs from 1979

to 1986)). Because "[s]uppliers have no control over resin prices," Sewell contends that any decreases in plastic bottle prices which correspond to decreasing resin prices were not caused by the formation and operation of Southeastern. Plaintiff's response, Tab 1 at 91–92. The court of course agrees that the formation and operation of Southeastern is not the *sole* cause of the decrease in plastic bottle prices from 1982 to 1986.

2. *Production of Plastic Bottles Increased Substantially (More than Double).*

The parties adopted different theoretical methods of measuring output of plastic bottles in the Southeast area.

Plaintiff focuses on sales and defendants focus on production. However, the actual data compiled by the parties for sixteen ounce/half liter bottles, two liter bottles and three-liter bottles, set forth in Tables 1–3, is virtually identical. Thus, the court finds that there is no genuine dispute as to the material facts regarding output in the relevant market. Because defendants' analysis of the data is more complete (they set forth data on output of one liter bottles supplied to them by Sewell and then aggregate across different bottle sizes by converting the data into "equivalent cases"[4]), the court will refer to defendants' results as set forth in Table 4.

Total output of plastic bottles in the relevant market has increased substantially every year from 1981 to 1986. Total output increased from 128.60 million equivalent cases in 1981 to 305.18 million equivalent cases in 1986, an increase of 137%. Also, total output in the relevant market by suppliers other than Southeastern also increased every year from 1981 to 1986. *See* Table 4.

3. *Market Concentration Has Decreased.*

The parties stipulated that the number of suppliers with manufacturing plants locat-

ed in the relevant market has remained the same since the formation of Southeastern through the end of 1987. "In 1982, prior to the start of Southeastern's shipments of plastic beverage bottles in or about October 1982, there were five companies having plants physically located in the 'Southeast area' which manufactured plastic beverage bottles: Sewell, Carolina Packaging, Amoco, Incon, and Owens–Illinois. In 1983, two former employees of Sewell, John Peacher and Rick Schwank, formed PSP and acquired Incon's plant in Columbia, SC. As of December 31, 1986, there were six companies having plants physically located in the 'Southeast area' which manufactured plastic beverage bottles: Sewell, Southeastern, Carolina Packaging, Amoco, PSP, and Owens–Illinois. In 1987, PSP was sold to Johnson Controls, and Constar (Sewell's parent company) purchased four of Owens–Illinois' plastic soft drink bottle manufacturing plants, including its one plant in the Southeast area (Birmingham, Alabama). As of December 31, 1987, there were five companies having plants physically located in the Southeast area: Sewell, Southeastern, Carolina Packaging, Johnson Controls, and Amoco." Stip. A para. 2.

Market concentration has *de*creased since Southeastern was formed. In 1981, before Southeastern's formation, Sewell had a 50.7% share of the Southeast area market and the top four companies were responsible for 93.7% of total output. In 1986, the largest producer was Southeastern with a 33.5% share, Sewell had a 28.9% share, and the top four companies were responsible for 86.2% of total output. *See* Table 4. The Herfindahl–Hirschman Index ("HHI"), a measure of market concentration derived by summing the squares of the market shares of the individual competitors, decreased from 3321 in 1981 to 2359 in 1986. DTX 301, Table 7.B.1.i. *See F.T.C. V. PPG Industries, Inc.*, 798 F.2d 1500, 1503 (D.C.Cir.1986) (HHI considered to be the superior measure of market concentration).

---

**4.** "Equivalent cases" is a standard measure in the soft drink industry which allows aggregation across different bottle sizes. The unit of measure is a 192 fluid ounce case, so that a 16 ounce bottle is .0833 equivalent cases, a two liter bottle is .3522 equivalent cases, a three liter bottle is .5283 equivalent cases and a one liter bottle is .1761 equivalent cases.

#### 4. *Retail Soft Drink Prices Have Decreased.*

Plaintiff states that "average retail soft drink prices to the consumer in two and three liter plastic bottles declined from 1982 to 1986 *throughout* the United States." Plaintiff's response, Tab 1 at 103 (citing PTX 6014 at Table 16). Plaintiff does not dispute that: (1) average retail prices for soft drinks to the consumer in two and three liter plastic bottles, in the Southeastern United States as defined by A.C. Nielsen Co. (which is not the same as the "Southeast area" market alleged by Sewell), declined from $3.53 per equivalent case in 1982 to $3.27 in 1986, and (2) in Nielsen's Southeastern United States market, the average price for two-liter Coca–Cola brands declined from $1.31 per bottle in 1982 to $1.24 in 1986. Plaintiff's response, Tab 1 at 102–03; DTX 302 at Tables 2.1, 4.2, 5.1. Although this decision does not depend upon a causal connection between the formation of Southeastern and lower soft drink prices, it is true that lower soft drink *bottle* prices facilitate lower retail soft drink prices.

#### 5. *Production Costs Have Decreased.*

Plaintiff states that "[p]roduction costs for plastic soft drink bottles were declining before Southeastern was formed." Plaintiff's response, Tab 1 at 106 (citing PTX 14,120; O.J. Peacher aff. dated April 10, 1989, at ¶ 10). Production costs have continued to decline *since* Southeastern was formed. For example, Sewell's standard cycle time for production of plastic bottles steadily decreased from 1977 through January, 1986. PTX 14,120, Table 7. Various Sewell internal documents state that Sewell must continue to reduce production costs in order to compete with cooperatives. *E.g.*, DTX 1515; DTX 1694; DTX 1763; DTX 1796; DTX 1807; DTX 1998.

#### 6. *Spending for Research and Development Does Not Appear to Have Been Substantially Affected.*

It is undisputed that certain companies have decreased research and development expenditures; they got out of the plastic bottle making business! Plaintiff's response, Tab 1 at 108. However, the evidence does not support a finding that overall research and development expenditures have decreased or increased. Since Southeastern was formed, new bottle sizes and types have been introduced in the market and as discussed, *supra*, production processes have become more efficient.

#### 7. *Quality and Service Have Not Substantially Changed.*

There is evidence that Southeastern has at times experienced quality problems with its bottles. However, the evidence does not support a finding that *overall* quality or *overall* service in the market has declined since the formation of Southeastern. A Sewell internal document suggests that competition from cooperatives has provided an impetus for Sewell to improve the quality of its bottles. DTX 1763 at 2.

#### 8. *Choice of Consumers as to the Kind of Bottle They Like to Buy Their Coke in Is Not Shown To Be a Material Element in the Case.*

Because the Coca–Cola bottlers sell products of The Coca–Cola Company in exclusive territories, the decision by a Coke bottler to sell its product in a certain type of package will necessarily deprive consumers in its territory of choice to buy Coke products in a different type of package. Sewell argues that by choosing to sell its products in the one-piece bottle manufactured by Southeastern, the Bottlers "forfeited the consumers' indisputable preference for the two-piece bottle." Plaintiff's response, Tab 1 at 112. Although there is evidence that in some surveys consumers, *other things being equal,* preferred the two-piece bottle with a base cup to the one-piece "petaloid" design, there is no evidence that consumers prefer a two-piece bottle over a *less expensive* one-piece bottle.

#### 9. *Defendants Do Not Have "Market Power."*

Plaintiff does not allege that Southeastern has *the ability to sell its bottles at prices above those that would be charged in a competitive market.* Southeastern's share of the Southeast area market was 33.5% in 1986. *See* Table 4. Since Southeastern seeks to produce bottles only for

Coca–Cola bottlers (Sewell Adm. 17.1), and plaintiff contends that Southeastern already "controls virtually every Coca–Cola bottler within its market" (Plaintiff's response, Tab 1 at 123), it seems unlikely that Southeastern will increase its market share materially in the future. According to Sewell's economists, the Coca–Cola bottler defendants had a 40% share of the soft drink market in the Southeast area in 1986. PTX 14,107. Thus, if Southeastern began to supply 100% of those Bottlers' requirements, its share of the plastic bottle market would only grow to approximately 40%.

Even with a 40% market share, there is no evidence that Southeastern would be able to increase prices profitably above the competitive level. Sewell's 1987 acquisition of Owens–Illinois gave Sewell a 39.2% share of the Southeast area market (based on 1986 data). *See* Table 4. Sewell's president testified that competition from other suppliers would prevent Sewell from increasing prices as a result of the acquisition. Nickels dep. at 293–94. Thus, there is no reason to infer market power solely on the basis of Southeastern's 1986 market share or its potential market share if it supplied all of the Bottlers' requirements. This conclusion is reinforced by plaintiff's argument that in 1981, when Sewell had a *50%* market share and the Southeast area market was more concentrated, Sewell was forced to meet lower price offers made to its customers by other suppliers. Furthermore, there is no evidence that Southeastern could charge supracompetitive prices if it attempted to increase its market share by selling plastic bottles to bottlers other than Coke bottlers. During the March 22, 1989, reargument, plaintiff's counsel admitted that since the formation of Southeastern, Sewell and the other competitors in the Southeast area market "fight like cats and dogs" on price, service and quality for the business of plastic bottle purchasers in the Southeast area other than the defendant Bottlers. Docket No. 205 at 40–41. Given the strength of Sewell and the other "major" players in the Southeast area market

(such as Amoco and Johnson Controls, *see* Docket No. 205 at 36–37), the court finds no reason to believe that Southeastern could overcome the "cat and dog" competition and charge a price above the competitive level.

Plaintiff has consistently argued that defendants have engaged in a buyer price-fixing conspiracy, in which the object is to depress market prices below the competitive level through combined purchasing power. In the complaint plaintiff alleges that:

19. Sometime in 1981, a number of the bottler defendants, encouraged by Coke, sought to fix the price at which they purchased plastic beverage bottles at lower than free market prices. Those defendants attempted to coerce lower bottle prices from their major supplier, Sewell, by threatening Sewell that if it failed to meet their demands, they would form their own captive manufacturer, which would foreclose Sewell from competing from their business for the foreseeable future.

20. Sewell did not agree to the bottlers' demands. True to their threats, the bottlers—assisted by defendant Coke and one or more persons affiliated with another Coke co-ooperative, Western Container of Texas—undertook the information of a collective manufacturing enterprise, which ultimately became Southeastern. The purpose and intent in forming Southeastern was to lock out Sewell and other plastic beverage bottle suppliers out of the Coke-bottler business in the areas where the bottlers were located.

The complaint itself casts doubt on plaintiff's theory that the Bottlers as a group of buyers possess market power, because it acknowledges that Sewell *rejected* the Bottlers' requests for lower prices.

Plaintiff now alleges that the Bottlers "successfully obtained *lower-than-market* price *offers* from Sewell through combined purchasing power" before the formation of "Southeastern." Plaintiff's response, Tab 1 at 122 (emphasis added). The evidence regarding two offers made by Sewell to the

Bottlers does not support this allegation.[5] First, there is evidence in the record that Sewell was charging at least one other customer, Atlantic Pepsi, less than it offered to charge the South Atlantic Canners group after the meeting at Litchfield Beach Inn on July 31, 1981. *See* Docket No. 224 at Addendum B (citations collected therein). Second, Sewell admits that in March, 1982, it offered "the South Atlantic Canners group a price of $220 per thousand for two-liter bottles (58 gram) on a bulk unlabelled basis, f.o.b. Sewell's plant, if the group would commit at least 40 to 42 million bottles annually to Sewell for a period of three years." Sewell Adm. 13.5. Sewell also admits that in March, 1982, it "entered into an agreement to sell two-liter plastic bottles (58 gram) to Atlanta Coke at $210 per thousand on a bulk unlabelled basis, f.o.b. Sewell's plant." Sewell Adm. 13.7. Not surprisingly, Sewell further admits that the price to Atlanta Coke was less than the price offered to the members of South Atlantic Canners as a group. Sewell Adm. 13.9. Thus, there is simply no evidence that the Bottlers received offers from Sewell below prices being offered to others in the Southeast area and, in any event, no allegation that the offers made by Sewell would have been sales below cost or otherwise unprofitable.

10. *Effect on Competitors.*

After joining Southeastern, the Bottlers have, in the aggregate, purchased over 17%, over $23.8 million, of their total dollar purchases of plastic bottles through 1986 from Sewell. Sewell Adm. 11.2, 11.3. The

final data compiled by defendants for use at trial confirms these admissions. DTX 301, Table 8.B.1.

Sewell is the largest producer of plastic soft drink containers in the country. Sewell Adm. 15.1. Sewell has made a profit on its plastic container operations every year since 1977. Sewell Adm. 15.2. From 1978 through 1986, Sewell's return on net operating assets exceeded 16% in every year except 1984. Sewell Adm. 15.3. For the twelve months ending November, 1986, Sewell's return on net operating assets was 23.78%, which exceeded its projection for 1986 of 20.1%. Sewell Adm. 15.4.

Although there is not specific data on the profitability of other competitors, there is evidence that after the formation of Southeastern: (1) Incon went out of business and its plant was acquired by PSP; (2) PSP was sold to Johnson Controls; and (3) Constar (Sewell's parent) purchased Owens–Illinois' plant in the Southeast area. Stip. A para. 2. Sewell admits that the Owens–Illinois plants acquired by Constar had been profitable when operated by Owens–Illinois. Sewell Adm. 16.3. Sewell also admits that PSP's sales and profits increased each year from 1983 to 1987. Sewell Adm. 16.7.

During the March 22, 1989, reargument, the court engaged plaintiff's counsel in the following dialogue:

COURT: Let me ask another question about that. Was anybody else pushing to invade or take over or get into this market besides the parties to this case?

PLAINTIFF'S COUNSEL: Absolutely.

---

5. Plaintiff alleged that the Bottlers specifically demanded a price of $200 per thousand bottles during a meeting at the Litchfield Beach Inn. Docket No. 102A at 10. The court accepted this allegation as a fact in the May 6, 1988, order. Docket No. 146 at 6. Plaintiff has renewed this allegation. Plaintiff's response, Tab 1 at 125. Defendants have urged the court to review this finding. Docket No. 246 at 16.

The court has reviewed the material cited by plaintiff in support of its allegation. *See* PTX 280; Endres dep. at 401–05; 446–47; Maffeo dep. at 156–57; Stewart Dep. at 219–21. The evidence simply does not support the assertion that the Bottlers demanded a specific price of $200. First, there is no direct evidence, documents or testimony, about a specific price demand of $200. There is evidence that the Bot-

tlers knew that Western Container reported a two liter manufacturing cost of $200 per thousand. PTX 280. One of Sewell's witnesses, a participant in the meeting, testified that: (1) Sewell made an initial offer which was rejected; (2) Sewell made a second, lower offer which was rejected; (3) he "believe[s] that they were comparing the price [Sewell offered] to what Western Container was manufacturing for"; and (4) Sewell's lower offer apparently was rejected because it was higher than Western Container's manufacturing cost. Endres dep. at 401–05. The testimony does not properly give rise to the inference that the Bottlers demanded that Sewell offer them a price of $200. Thus, the court vacates its prior finding of Sewell's allegation as a fact.

COURT: Has there been any other big operator in this market except these two during the pertinent period?

PLAINTIFF'S COUNSEL: Yes. There was well before Southeastern ever came along.

Docket No. 205 at 36.

Johnson Controls is the second largest merchant supplier of plastic beverage bottles in the country. *See* Sewell Adm. 16.1. Johnson Controls' stated reason for purchasing PSP was a desire to have a manufacturing plant for plastic beverage bottles in the Southeast area. Sewell Adm. 16.9. In fact, when Constar purchased the four plants from Owens–Illinois in 1987, Johnson Controls was also interested in acquiring those plants. Sewell Adm. 16.2.

## IV. CONCLUSIONS OF LAW

A. Reconsideration of Defendants' Motion for Summary Judgment.

The May 6, 1988, partial denial of defendants' motion for summary judgment was an interlocutory order. *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858, 862 (5th Cir.1970). "[B]ecause the order was interlocutory, 'the court at any time before final decree [could] modify or rescind it.'" *Id.* (quoting *John Simmons Co. v. Grier Brothers Co.,* 258 U.S. 82, 88, 42 S.Ct. 196, 198, 66 L.Ed. 475 (1922)); *Lindsey v. Dayton–Hudson Corp.,* 592 F.2d 1118, 1121 (10th Cir.), *cert. denied,* 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979); Fed.R. Civ.P. 54(b). Thus, vacating the May 6, 1988, order was within the court's power and is reviewed under an abuse of discretion standard. *Bon Air,* 426 F.2d at 862 (citing *Marconi Wireless Telegraph Co. v. United States,* 320 U.S. 1, 47–48, 63 S.Ct. 1393, 1414–15, 87 L.Ed. 1731 (1943)).

The court was "free in its discretion to grant a reargument based either on all the evidence then of record or only evidence before the court when it rendered its interlocutory decision, or to reopen the case for further evidence." *Marconi,* 320 U.S. at 48, 63 S.Ct. at 1415. Even if no new material is presented, reconsideration of a previously denied summary judgment mo-

tion is proper because "the court was not bound to perpetuate error if it later believed it had committed such." *Burns v. Massachusetts Institute of Technology,* 394 F.2d 416, 418 (1st Cir.1968); *Lindsey,* 592 F.2d at 1121.

Plaintiff claims that the court committed error by requiring reargument on defendants' motion for summary judgment on less than ten days notice. Plaintiff's objection is groundless. The court had the power to call for reargument on the basis of the evidence before the court when it initially denied defendants' motion. Unless plaintiff is conceding that the original summary judgment record was inadequate to support the court's initial decision to set this case for trial, the court certainly was not required to give plaintiff ten days to prepare to reargue, on the existing record, a motion filed 16 months earlier and argued twice before. However, even if the court did not give plaintiff adequate time to prepare for reargument, any prejudice to plaintiff has been cured by the court's willingness to consider all materials filed by the parties after the court announced its intention to grant defendants' motion for summary judgment on March 28, 1989. *See Barney v. I.R.S.,* 618 F.2d 1268, 1271 n. 8 (8th Cir.1980) (failure to give plaintiff opportunity to respond required by Fed.R. Civ.P. 56(c) substantially cured by reconsidering decisions in light of additional materials submitted by plaintiff).

B. The Standard for Summary Judgment.

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).

Plaintiff Sewell has the burden of proof at trial on each and every element of its claims under the federal antitrust laws and the North Carolina Unfair Trade Practices Act. The Supreme Court has stated that:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for dis-

covery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, the Supreme Court in *Celotex* continued by stating that:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

477 U.S. at 323, 106 S.Ct. at 2553. The court concludes that defendants have met their initial burden of production under Rule 56.

The Supreme Court, in another antitrust case, explained the next step in the summary judgment process.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some *metaphysical doubt as to* the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations and footnotes omitted).

Sewell contends that defendants' "purpose and intent in forming Southeastern was to lock Sewell and other plastic beverage bottle suppliers out of the Coke-bottler business in the areas where the bottlers were located." Complaint para. 20. This claim makes no economic sense in the factual context of this case, because Sewell cannot explain how the Bottlers would benefit in a way prohibited by the antitrust laws (*i.e.,* earning monopoly profits) by forming a corporation to manufacture plastic bottles for sale to themselves. Because the Bottlers' profits ultimately derive from the sale of soft drinks packaged in plastic bottles, the Bottlers have no economic incentive to invest in a cooperative manufacturing enterprise and "lock out" existing suppliers if that will raise the cost of an input such as the plastic bottle to themselves. Once the decision to invest is made, the Bottlers do have an economic incentive to cause their cooperative manufacturing enterprise to produce plastic bottles of the highest quality at the lowest possible price.

As plaintiff points out, when Southeastern was formed it "used the same basic technology ... generally in use in the industry." Plaintiff's response, Tab 1 at 106. Thus, assuming that Southeastern would experience economies of scale similar to its competitors, one would expect Southeastern to be as efficient as its competitors and produce a bottle of the same or similar quality. Because Southeastern only sells bottles to its owner-members, there is no economic incentive for Southeastern to sell bottles at any price other than a price at or slightly above its total cost of production (including, for example, research and development expenditures). Selling at a price

below cost would simply require the Bottlers to make capital contributions to Southeastern in the amount of any loss, offsetting any aggregate benefit from the lower prices charged to the Bottlers. Selling at a price very much above the actual cost of production would increase the effective price of bottles by causing Southeastern to earn high profits, which could not simply be distributed back to the Bottlers as dividends because they would first be subject to the corporate income tax. Thus, as an efficient producer pricing its product at or just above its costs, one would expect the entry of Southeastern in the market to have a *pro* competitive impact. The facts of this case confirm that expectation.

Although plaintiff's claim is rendered implausible by the factual context of this case, the court has not required plaintiff to make a more persuasive showing because plaintiff has simply failed to come forward with specific facts to support a finding that competition has been adversely affected.

C. Claims Under Sherman Act § 1.

Section 1 of the Sherman Act of 1890 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1982). Every commercial agreement restrains trade. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Rejecting a literal interpretation of the statute, the Supreme Court has repeatedly emphasized that the legality of an agreement depends on whether it is adjudged to be an unreasonable restraint on trade. *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2958–59, 82 L.Ed.2d 70 (1984).

Since the decision in *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), restraints have been analyzed under the "rule of reason" unless the "challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming

value are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Northwest Stationers v. Pacific Stationery*, 472 U.S. 284, 289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). Plaintiff claims that defendants' practices are illegal under both the *per se* approach and the rule of reason.

1. *Per se* Violations.

Whether to apply the *per se* rule depends on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978)). In the order of May 6, 1988, the court thoroughly discussed and rejected plaintiff's claims that defendants have committed *per se* violations of Section 1 of the Sherman Act. Docket No. 146. The court adheres to that determination.

2. Rule of Reason.

■ "[T]he rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). Judge Breyer has pointed out that " 'unreasonableness' in antitrust law has a rather special meaning. It means that the anticompetitive consequences of a particular action or arrangement outweigh its legitimate business purposes." *Interface Group, Inc. v. Mass. Port Authority*, 816 F.2d 9, 10 (1st Cir.1987) (citing 7 P. Areeda, *Antitrust Law* ¶ 1500, at 362–63 (1986)). The necessary implication of such a balancing test is that "[w]ithout a showing of actual adverse effect on competition, [one]

cannot make out a case under the antitrust laws...." *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984).

Judge Breyer also noted that the term "anticompetitive" also has a special meaning in antitrust law. *Anticompetitive actions* are not those "that merely injure competitors, but [are] *actions that harm the competitive process,* a process that aims to bring consumers the benefits of lower prices, better products and more efficient production methods." *Interface Group,* 816 F.2d at 10 (citations omitted and emphasis added). Plaintiff has failed to prove that defendants' actions have harmed or will harm the competitive process. Since the formation of Southeastern through 1986, plastic bottle prices have decreased, output of plastic bottles has increased, the number of competitors has remained the same, market concentration has decreased, and production processes have become more efficient. At best, plaintiff has shown that Southeastern has at times experienced quality problems with its bottles and that certain companies have decreased research and development expenditures. However, plaintiff has not produced evidence of a decline in overall plastic bottle quality or research and development expenditures in the market as a whole.

Plaintiff has not produced any legally sufficient evidence of predatory pricing by Southeastern. Plaintiff's only allegation of predatory pricing, which was not made as part of the original summary judgment record, involves the sale of three-liter bottles by Southeastern in 1985. The Supreme Court has not yet reached a consensus on the proper definition of predatory pricing in the antitrust context. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117 n. 12, 107 S.Ct. 484, 493 n. 12, 93 L.Ed.2d 427 (1986). However, leading commentators and several circuits presume that prices below reasonably anticipated marginal cost are predatory. *Northeastern Tel. Co. v. AT & T,* 651 F.2d 76, 88 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (citations collected therein). Because marginal cost cannot be determined from conventional accounting methods, average variable cost is used as a surrogate. *Id.* Plaintiff has not produced evidence that Southeastern's sales of three-liter bottles in 1985 were below its marginal or average variable costs. Furthermore, because competitors in the Southeast area sell a full line of plastic beverage bottles, the court holds that three-liter bottles alone cannot be considered a relevant product for purposes of predatory pricing analysis. The relevant product must be defined with reference to the danger of predatory pricing. The danger of predatory pricing is that rivals will be driven out of the market. In this case, "[t]he pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line ... unless this placed the overall price of the line at the predatory level." *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). *Accord Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 305 (5th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984). Thus, although pricing below average total cost also might be considered predatory, the evidence in the record demonstrates that Southeastern's revenues from its full product line exceeded its costs in 1985.

Plaintiff has failed to prove that Southeastern or the Bottlers possess market power. "Market power is the ability to raise prices above those that would be charged in a competitive market." *NCAA,* 468 U.S. at 109 n. 38, 104 S.Ct. at 2964 n. 38. Market power cannot be determined by market share alone. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1414 (7th Cir.1989). In this case there is no evidence that Southeastern has raised or could raise market prices above the competitive level or, conversely, that the Bottlers could depress market prices below the competitive level. Without evidence of market power, there is no basis for finding "undue" foreclosure of the relevant market. *See Alberta Gas Chemicals Ltd. v. E.I. DuPont de Nemours & Co.,*

826 F.2d 1235, 1244–46 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); 4 P. Areeda & D. Turner, *Antitrust Law* ¶ 1004 at 221 (1980).

If plaintiff had made a showing of actual adverse effect on competition, then under the rule of reason the "court must consider whether there are any procompetitive justifications for the use of the ... restriction at issue." *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289, 1294 (4th Cir.), *cert. denied*, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987). In considering whether a restraint or restriction is reasonable, the court should consider whether there are less restrictive means of achieving any procompetitive benefits.

Southeastern's supply contracts are reasonably justified means of achieving legitimate, procompetitive purposes. The Supreme Court recognized long ago that "requirements contracts ... [are] of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified [because they] offer the possibility of a predictable market." *Standard Oil Co. v. United States*, 337 U.S. 293, 306–07, 69 S.Ct. 1051, 1058–59, 93 L.Ed. 1371 (1949). Southeastern's supply contract recites "that in order for [Southeastern] to become a successful operation, [Southeastern] must be assured of a ready market for its products." PTX 685. Sewell argues that the supply contracts were "not signed to 'support' the investment" and "were not needed for the investment," because "the signing of the supply contracts contravened the prevailing practices in the industry in 1982." Plaintiff's response, Tab 1 at 60. Even if we assume that purchasers of plastic bottles were not willing to sign supply contracts with *established* suppliers in 1982, that assumption does not make it unreasonable for buyers to sign such contracts with a potential entrant to the market. This is particularly true where, as in this case, the buyers have a financial interest in the newcomer.

There is no evidence that Southeastern's sales of plastic bottles to the Bottlers at the same delivered price is unjustified. The use of a delivered price equalizes freight costs among the Bottlers. In the absence of a delivered price, each of the Bottlers would have had an economic incentive to require that Southeastern's manufacturing plant be located close to it. Thus, use of a delivered price eliminated any advantage from being located relatively near the plant. This removed a potential obstacle to the formation of Southeastern and had plausible utility in attracting investors to the enterprise, thereby increasing volume and reducing Southeastern's marginal cost of production.

The "price competition" clause in Southeastern's contracts is reasonably justified. Requirements contracts need not contain price competition clauses to be reasonable. Here, there was no significantly less restrictive means available to protect Southeastern from the perceived and ultimately actual threat of selective pricing to key member bottlers by a single established supplier such as Sewell in order to prevent the formation or disrupt the operation of Southeastern.

Plaintiff has failed to set forth specific facts demonstrating an actual or probable adverse impact on competition. Therefore, plaintiff's claims under section 1 of the Sherman Act should be dismissed.[6]

6. Sewell also claims that a joint arrangement, which began in the fall of 1985 and lasted through approximately 1987, for purchasing PET resin, among Southeastern and two other companies (Western Container and Apple Container), is illegal. The only mention of resin purchasing in the complaint charges The Coca-Cola Company with purchasing, "through an entity which it effectively controls, PET materials for Southeastern in combination with purchases for Coke's own operations, affording Southeastern an advantage in the purchase of PET materials which it otherwise would not enjoy." Complaint at para. 36, 51(d). Sewell contends that Coke is deemed to have "participated" through its ownership interest in one of the entities. However, the parties stipulated (Stip. A para. 30) that The Coca-Cola Company did not participate in the discussions in which the agreement to negotiate resin purchases was reached or in any ensuing negotiations for the purchase of resin on behalf of any of these three entities.

In the May 6, 1988, order, the court denied plaintiff's motion to declare the joint resin purchasing agreement to be illegal *per se* under

**D. Exclusive Dealing Claims.**

█ Southeastern's supply contract is not an *exclusive* dealing arrangement on its face; the Bottlers are free to purchase 20% of their requirements from other suppliers such as Sewell. However, Section 3 of the Clayton Act applies to contracts that "do not contain specific agreements not to use the [goods] of a competitor," if "the practial effect ... is to prevent such use." *United Shoe Mach. Co. v. United States,* 258 U.S. 451, 457, 42 S.Ct. 363, 365, 66 L.Ed. 708 (1922). The court need not resolve whether the practical effect of Southeastern's supply contracts is to prevent the use of other suppliers' goods. Assuming that the supply contracts are exclusive dealing arrangements, the court would analyze them under the rule of reason. *Chuck's Feed & Seed,* 810 F.2d at 1293–95.

For the reasons discussed, *supra,* plaintiff has failed to point out specific facts demonstrating a genuine issue of material fact for trial.

**E. Sewell's Other Claims.**

█ Sewell's other federal claims—unlawful acquisitions under Section 7 of the Clayton Act and attempted monopolization under Section 2 of the Sherman Act—require a showing of actual or probable adverse effect on competition. 15 U.S.C. § 18 (barring acquisitions of stock if the "effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly"); *International Distri-*

*bution Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 790 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (element of Sherman Act § 2 claim is anticompetitive or exclusionary conduct). As discussed, *supra,* Sewell's evidence is insufficient to establish any actual or probable adverse effect on competition. Thus, these claims should be dismissed.

█ Plaintiff's claim under N.C.Gen. Stat. § 75–1, which forbids combinations in restraint of trade, should be dismissed for the reasons set forth in Section IV.C.2, *supra. Rose v. Vulcan Materials Co.,* 282 N.C. 643, 655, 194 S.E.2d 521 (1973) (law applying Sherman Act instructive in determining reach of § 75–1).

Plaintiff's claim under N.C.Gen.Stat. § 75–1.1, which forbids unfair and deceptive trade practices, also should be dismissed. The Fourth Circuit Court of Appeals has interpreted the *South* Carolina Unfair Trade Practices Act, which is very similar in language and scope to § 75–1.1, to require a showing of an adverse effect on competition when the claim is directed at anticompetitive (rather than unfair or deceptive) practices. *Chuck's Feed & Seed,* 810 F.2d at 1295–96. The Fourth Circuit cited with approval *Stearns v. Genrad, Inc.,* 564 F.Supp. 1309 (M.D.N.C.1983), *aff'd on other grounds,* 752 F.2d 942 (4th Cir.1984), which granted summary judgment on a claim under § 75–1.1 because

Section 1 of the Sherman Act. Docket No. 146. On January 17, 1989, Sewell moved that the court clarify the May 6, 1988, order as it related to Sewell's *per se* resin price-fixing claim. Docket No. 184. This motion was heard on March 1, 1989. Since the court was preparing to try this action for six weeks, the court decided that it would hear plaintiff's evidence at trial under the rule of reason approach and address the legal issues on a motion for directed verdict. *See* Docket No. 196 (March 3, 1989, order). By letter to the court dated March 6, 1989, defendants objected to that ruling.

Plaintiff never moved to amend the complaint in order to allege that the joint resin purchasing agreement was illegal. Because resin sellers would be more directly injured by an illegal joint purchasing arrangement than other resin buyers, plaintiff may not have standing to pursue such a claim. *See Cargill, Inc. v. Monfort of Colorado, Inc,* 479 U.S. 104, 111 n. 6, 107 S.Ct.

484, 490 n. 6, 93 L.Ed.2d 427 (1986). More importantly, joint purchasing arrangements are not illegal unless the buyers collectively possess market power. Plaintiff has failed to set forth any facts (1) delineating the relevant product or geographic market and (2) demonstrating that the three entities collectively possessed market power in the relevant market. Disregarding what appear to be numerous valid objections by defendants, the only evidence offered by plaintiff in support of this "claim" simply demonstrates that after joint negotiations began, Southeastern obtained a lower price from a *single* supplier (American Hoechst) for a *different type of resin* than Sewell purchased from the same supplier from October, 1985, through February, 1986. Docket No. 235, Tab 7. Assuming that Sewell had standing to assert and had properly asserted a claim about the joint resin purchasing agreement, this proof is simply inadequate to support Sewell's "claim."

plaintiff made no showing of an adverse effect on competition. 810 F.2d at 1295–96. Furthermore, on the facts presented, the court holds that plaintiff's claim under § 75–1.1 is insufficient as a matter of law. *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975) (whether practice is unfair or deceptive is a question of law for the court to decide).

Plaintiff's claim under N.C.Gen.Stat. § 75–5(b)(2), which is an exclusive dealing provision, should be dismissed for the reasons set forth in Section IV.D, *supra. Stearns*, 564 F.Supp. at 1318 (requiring showing of adverse effect on competition); Aycock, "Antitrust and Unfair Trade Practice Law in North Carolina—Federal Law Compared," 50 N.C.L.Rev. 199, 230 (1972) (requirements contracts which do not expressly forbid dealing in goods of a competitor should be tested under the rule of reason).

*Stearns* holds that a showing of adverse effect on competition is required under N.C.Gen.Stat. § 75–5(b)(3), which forbids willful injury of "the business of any competitor or business rival in this State with the purpose of attempting to fix the price of any goods when the competition is removed." 564 F.Supp. at 1318. Thus, this claim should be dismissed.

█ Plaintiff's remaining state law claims, N.C.Gen.Stat. §§ 75–5(b)(1,7), are directed at alleged price-fixing by defendants. Section 75–5(b)(1) forbids buyer price-fixing conspiracies and § 75–5(b)(7) forbids buyer price-fixing generally. In the May 6, 1988, order, the court held that defendants' activities were not illegal *per se* as price-fixing. Docket No. 146 at 17–20. That reasoning is equally applicable here. At most the Bottlers have set a price (through their representatives on Southeastern's board of directors) which will be charged to them by their joint venture. There is no evidence that defendants have "fixed" the price at which other suppliers in North Carolina sell plastic bottles or other bottlers in North Carolina purchase plastic bottles. The court holds that the facts set forth by plaintiff are not suffi-

cient for a rational trier of fact to find that defendants violated §§ 75–5(b)(1,7).

F. *"Antitrust* Injury."

█ "To supplement enforcement of the antitrust laws, Congress has created private causes of action to recover treble damages and obtain equitable relief. *See* 15 U.S.C. §§ 15, 26." *Alberta Gas*, 826 F.2d at 1239. "This additional avenue of enforcement, however, is not open to all who might be interested in punishing the wrongdoer or who might have suffered some peripheral loss." *Id.*

The Supreme Court has limited private enforcement of the antitrust laws by construing the remedial provisions of the Clayton Act to require proof of "antitrust injury." In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Court held that plaintiffs seeking treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, must show more than simply an "injury causally linked to an illegal presence in the market"; instead, "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697 (emphasis in original).

In *Brunswick*, plaintiffs were 3 of the 10 bowling centers owned by a relatively small bowling chain. The defendant, one of the two largest bowling chains in the country, acquired several bowling centers located in plaintiffs' market that would have gone out of business but for the acquisition. Plaintiffs sought treble damages under § 4, alleging as injury the "loss of income that would have accrued had the acquired centers gone bankrupt." *Id.* at 487, 97 S.Ct. at 697. The Supreme Court held that this injury, although causally related to a merger alleged to violate § 7 of the Clayton Act, was not an *antitrust* injury because "[i]t is inimical to the purposes of [the antitrust] laws to award damages" for losses stemming from continued competition. *Id.* at 488, 97 S.Ct. at 697.

In *Cargill*, 479 U.S. 104, 107 S.Ct. 484, the Court held that in order to obtain in-

junctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, a private plaintiff must show a threat of antitrust injury. In *Cargill*, plaintiff, the country's fifth largest beef packer, brought an action to enjoin the proposed merger of the second and third largest beef packers in the country. Plaintiff alleged that it was threatened with a loss of profits by the possibility that defendants, after the merger, would lower prices to a level at or above its costs in an attempt to increase market share. The Court held that "the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury." *Id.* at 117, 107 S.Ct. at 493.

Plaintiff now claims that from 1983 through 1986 it lost $20.7 million in profits due to the loss of $101.2 million in sales to the Bottlers. PTX 14,000. Assuming plaintiff could prove that defendants' conduct violates one of the substantive provisions of the Sherman Act or the Clayton Act, plaintiff's lost sales to the Bottlers would be causally linked to the "illegal" formation and operation of Southeastern. However, it does not follow that Sewell's lost sales would have occurred by reason of that which made Southeastern's formation and operation illegal. *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 ("while respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful").

Plaintiff's counsel admits that this "is not in antitrust parlance a predatory pricing case." Docket No. 218 at 138 (Trial Transcript, March 23, 1989). Sewell does not claim that its plastic bottle operations in the Southeast area have been unprofitable. Moreover, there is no evidence that if Southeastern had not been formed or that if it had been formed without the restraints challenged by Sewell, that Sewell would have retained the Bottlers' business from 1983 through 1986. "Mindful that antitrust law aims to protect competition, not competitors, we must analyze the antitrust injury question from the viewpoint of the consumer." *Alberta Gas*, 826 F.2d at 1241. Where, as here, the Bottlers and other consumers of plastic bottles in the

Southeast area have benefitted from decreased, nonpredatory prices, to allow Sewell to recover treble damages for lost sales to the Bottlers would be to allow a windfall.

Even if Sewell had set forth specific facts demonstrating an actual or probable adverse impact on competition, Sewell has failed to set forth specific facts demonstrating actual or threatened antitrust injury. Because Sewell would not be entitled to any relief, its federal claims should be dismissed. Under N.C.Gen.Stat. § 75–16, which establishes private causes of action and provides for treble damages, the North Carolina courts apply the standard of proximate cause articulated in federal antitrust cases. *American Rockwool, Inc. v. Owens–Corning Fiberglas*, 640 F.Supp. 1411, 1444 (E.D.N.C.1986) (citing North Carolina Pattern Jury Instructions—Civil § 813.70) Thus, plaintiff's state law claims also should be dismissed for failure to prove antitrust injury.

## V. EPILOGUE

Judge J. Dickson Phillips, writing for the Fourth Circuit Court of Appeals in *Pocahontas Supreme Coal Co. v. Bethlehem Steel*, 828 F.2d 211 (4th Cir.1987), affirmed the district court's grant of summary judgment against an antitrust plaintiff, stating that:

We think that the district court rightly adjudged that despite adequate opportunity to put a forecast of hard proof of its § 8 claim on the line, Pocahontas had not done so. In those circumstances a court need not withhold summary judgment, even in complicated cases such as antitrust, simply because there may remain 'some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The burden cast upon Pocahontas was to come forward with 'specific facts showing that there is a genuine issue for trial,' Fed.R.Civ.P. 56(e); it could not at this point rely only on its conclusory pleading allegations to hold the case at issue. *See Matsushita*, 106 S.Ct. at

1356. The district court rightly perceived that on no more hard evidence than Pocahontas had put in the record no rational trier of fact, properly instructed in the substantive law and on the burden of proof, could find for Pocahontas on its § 8 claim, and that summary judgment was therefore appropriate. *See id.* 828 F.2d at 217.

There is a failure of proof in this action also. Despite adequate opportunity to put "on the line" a "forecast of hard proof" of an actual or probable adverse effect of defendants' activities on competition, Sewell has not done so. Even if Sewell had advanced "some" proof of anticompetitive effect, any restraints on trade arising out of defendants' formation and operation of Southeastern were reasonably necessary to achieve *pro* competitive benefits which clearly outweigh any anticompetitive effect. Finally, even if defendants' activities had violated the antitrust laws, Sewell has failed to prove that it sustained "antitrust injury" entitling it to monetary or injunctive relief.

Plaintiff's claims should be dismissed.

Defendant Southeastern is entitled to trial of its counterclaims.

An appropriate judgment will be entered.

TABLE 1

Output of 2-liter Plastic Bottles in Sewell's Market
1981–1986

| | Plaintiff's Sales Data | Defendants' Production Data |
|---|---|---|
| | (millions of bottles) | (millions of bottles) |
| **1981** | | |
| Sewell | 179.63 | 179.38 |
| Owens–Illinois | 64.12 | 69.97 |
| Carolina Packaging | 63.80 | 63.80 |
| Amoco | 23.31 | 23.31 |
| Incon | 23.00 | 23.00 |
| SEC | NA | NA |
| Total | 353.87* | 359.46 |
| **1982** | | |
| Sewell | 195.79 | 195.77 |
| Owens–Illinois | 82.06 | 82.06 |
| Carolina Packaging | 69.89 | 69.38 |
| Amoco | 47.38 | 47.38 |
| Incon | 30.00 | 30.00 |
| SEC | 6.25 | 6.25 |
| Total | 431.37 | 430.83* |
| **1983** | | |
| Sewell | 191.82 | 191.47 |
| Owens–Illinois | 89.92 | 89.92 |
| Carolina Packaging | 66.85 | 66.85 |
| SEC | 61.26 | 61.26 |
| Amoco | 47.16 | 47.16 |
| Incon/PSP | 33.00 | 33.00 |
| Total | 490.01 | 489.66 |
| **1984** | | |
| Sewell | 206.99 | 206.99 |
| Owens–Illinois | 78.54 | 78.54 |
| SEC | 92.66 | 92.66 |
| Carolina Packaging | 66.62 | 66.60 |
| Amoco | 44.88 | 44.88 |
| PSP | 42.13 | 42.13 |
| Total | 531.82 | 531.80 |

| | Plaintiff's Sales Data (millions of bottles) | Defendants' Production Data (millions of bottles) |
|---|---|---|
| **1985** | | |
| Sewell | 202.89 | 202.90 |
| SEC | 148.80 | 148.80 |
| Owens–Illinois | 37.80 | 37.84 |
| Carolina Packaging | 68.30 | 68.31 |
| PSP | 64.28 | 64.28 |
| Amoco | 37.51 | 37.51 |
| Total | 559.59* | 559.64 |
| **1986** | | |
| SEC | 177.42 | 177.42 |
| Sewell | 185.42 | 183.51 |
| PSP | 70.20 | 70.20 |
| Carolina Packaging | 74.19 | 74.19 |
| Owens–Illinois | 29.75 | 32.44 |
| Amoco | 30.14 | 30.14 |
| Total | 567.12 | 567.90 |

NA = not applicable.
*–Numbers may not add due to rounding.
Source: Docket No. 235, Tab 1; Docket No. 224, Addendum A.

TABLE 2

Output of 16–ounce/Half liter Plastic Bottles in Sewell's Market
1981–1986

| | Plaintiff's Sales Data (millions of bottles) | Defendants' Production Data (millions of bottles) |
|---|---|---|
| **1981** | | |
| Sewell | 14.55 | 14.55 |
| Owens–Illinois | 0.00 | 0.00 |
| Carolina Packaging | 0.03 | 0.03 |
| Amoco | 0.00 | 0.00 |
| Incon | 0.00 | 0.00 |
| SEC | NA | NA |
| Total | 14.58 | 14.58 |
| **1982** | | |
| Sewell | 30.95 | 30.95 |
| Owens–Illinois | 0.00 | 0.00 |
| Carolina Packaging | 16.97 | 16.97 |
| Amoco | 3.12 | 3.12 |
| Incon | 0.00 | 0.00 |
| SEC | 0.00 | 0.00 |
| Total | 51.05* | 51.05* |
| **1983** | | |
| Sewell | 62.25 | 62.26 |
| Owens–Illinois | 0.00 | 0.00 |
| Carolina Packaging | 34.55 | 34.55 |
| SEC | 0.00 | 0.00 |
| Amoco | 0.51 | 0.51 |
| Incon/PSP | 0.00 | 0.00 |
| Total | 97.31 | 97.31* |
| **1984** | | |
| Sewell | 77.40 | 77.39 |
| Owens–Illinois | 0.00 | 0.00 |
| SEC | 0.00 | 0.00 |
| Carolina Packaging | 43.14 | 43.14 |
| Amoco | 0.00 | 0.00 |
| PSP | 1.39 | 1.39 |
| Total | 121.93 | 121.93* |

| | Plaintiff's Sales Data (millions of bottles) | Defendants' Production Data (millions of bottles) |
|---|---|---|
| **1985** | | |
| Sewell | 67.97 | 67.97 |
| SEC | 136.52 | 136.52 |
| Owens–Illinois | 0.00 | 0.00 |
| Carolina Packaging | 65.48 | 65.48 |
| PSP | 0.14 | 0.14 |
| Amoco | 0.00 | 0.00 |
| Total | 270.10* | 270.10* |
| **1986** | | |
| SEC | 295.36 | 295.35 |
| Sewell | 45.43 | 45.43 |
| PSP | 22.54 | 22.54 |
| Carolina Packaging | 98.70 | 98.43 |
| Owens–Illinois | 0.00 | 0.00 |
| Amoco | 0.00 | 0.00 |
| Total | 462.03 | 461.75 |

NA = not applicable.
*–Numbers may not add due to rounding.
Source: Docket No. 235, Tab 1; Docket No. 224, Addendum A.

TABLE 3
Output of 3-liter Plastic Bottles in Sewell's Market
1981–1986

| | Plaintiff's Sales Data (millions of bottles) | Defendants' Production Data (millions of bottles) |
|---|---|---|
| **1981** | | |
| Sewell | NA | NA |
| Owens–Illinois | NA | NA |
| Carolina Packaging | NA | NA |
| Amoco | NA | NA |
| Incon | NA | NA |
| SEC | NA | NA |
| Total | NA | NA |
| **1982** | | |
| Sewell | NA | NA |
| Owens–Illinois | NA | NA |
| Carolina Packaging | NA | NA |
| Amoco | NA | NA |
| Incon | NA | NA |
| SEC | NA | NA |
| Total | NA | NA |
| **1983** | | |
| Sewell | NA | NA |
| Owens–Illinois | NA | NA |
| Carolina Packaging | NA | NA |
| SEC | NA | NA |
| Amoco | NA | NA |
| Incon/PSP | NA | NA |
| Total | NA | NA |
| **1984** | | |
| Sewell | 7.60 | 7.60 |
| Owens–Illinois | 17.42 | 17.42 |
| SEC | 0.00 | 0.00 |
| Carolina Packaging | 0.01 | 0.01 |
| Amoco | 0.01 | 0.01 |
| PSP | 0.00 | 0.00 |
| Total | 25.05* | 25.05* |

| | Plaintiff's Sales Data (millions of bottles) | Defendants' Production Data (millions of bottles) |
|---|---|---|
| **1985** | | |
| Sewell | 27.84 | 27.84 |
| SEC | 14.69 | 14.69 |
| Owens–Illinois | 33.72 | 37.91 |
| Carolina Packaging | 1.42 | 1.42 |
| PSP | 10.70 | 10.70 |
| Amoco | 0.16 | 0.16 |
| Total | 88.53 | 92.72 |
| **1986** | | |
| SEC | 28.56 | 28.56 |
| Sewell | 33.03 | 33.71 |
| PSP | 22.40 | 22.40 |
| Carolina Packaging | 0.06 | 0.06 |
| Owens–Illinois | 33.43 | 37.80 |
| Amoco | 0.00 | 0.00 |
| Total | 117.49 | 122.53 |

NA = not applicable.

*–Numbers may not add due to rounding.

Source: Docket No. 235, Tab 1; Docket No. 224, Addendum A.

TABLE 4

Total Output in Sewell's Market
1981–1986

| | 2 Liter | 16 Oz/ Half Liter | Three Liter | 1 Liter | All Bottles Combined |
|---|---|---|---|---|---|
| | | (MM Bottles) | | (MM Equiv. Cases) | |
| | (1) | (2) | (3) | (4) | (5) |
| **1981** | | | | | |
| Sewell | 179.38 | 14.55 | NA | 3.99 | 65.16 |
| Owens–Illinois | 69.97 | 0.00 | NA | 0.00 | 24.65 |
| Carolina Packaging | 63.80 | 0.03 | NA | 0.00 | 22.48 |
| Amoco | 23.31 | 0.00 | NA | 0.00 | 8.21 |
| Incon | 23.00 | 0.00 | NA | 0.00 | 8.10 |
| SEC | NA | NA | NA | NA | NA |
| Total | 359.46 | 14.58 | NA | 3.99 | 128.60 |
| **1982** | | | | | |
| Sewell | 195.77 | 30.95 | NA | 2.51 | 72.12 |
| Owens–Illinois | 82.06 | 0.00 | NA | 0.00 | 28.90 |
| Carolina Packaging | 69.38 | 16.97 | NA | 0.00 | 25.93 |
| Amoco | 47.38 | 3.12 | NA | 0.00 | 16.96 |
| Incon | 30.00 | 0.00 | NA | 0.00 | 10.57 |
| SEC | 6.25 | 0.00 | NA | 0.00 | 2.20 |
| Total | 430.83 | 51.05 | NA | 2.51 | 156.69 |
| **1983** | | | | | |
| Sewell | 191.47 | 62.26 | NA | 2.07 | 73.29 |
| Owens–Illinois | 89.92 | 0.00 | NA | 0.00 | 31.67 |
| Carolina Packaging | 66.85 | 34.55 | NA | 0.00 | 26.59 |
| SEC | 61.26 | 0.00 | NA | 0.00 | 21.58 |
| Amoco | 47.16 | 0.51 | NA | 0.00 | 16.65 |
| Incon/PSP | 33.00 | 0.00 | NA | 0.00 | 11.62 |
| Total | 489.66 | 97.31 | NA | 2.07 | 181.41 |
| **1984** | | | | | |
| Sewell | 206.99 | 77.39 | 7.60 | 0.48 | 83.55 |
| Owens–Illinois | 78.54 | 0.00 | 17.42 | 0.00 | 36.87 |
| SEC | 92.66 | 0.00 | 0.00 | 0.00 | 32.64 |
| Carolina Packaging | 66.60 | 43.14 | 0.01 | 0.00 | 27.11 |
| Amoco | 44.88 | 0.00 | 0.01 | 0.00 | 15.81 |
| PSP | 42.13 | 1.39 | 0.00 | 0.00 | 14.96 |

| | 2 Liter | 16 Oz/ Half Liter | Three Liter | 1 Liter | All Bottles Combined |
|---|---|---|---|---|---|
| | | (MM Bottles) | | (MM Equiv. Cases) | |
| | (1) | (2) | (3) | (4) | (5) |
| Total | 531.80 | 121.93 | 25.05 | 0.48 | 210.94 |
| **1985** | | | | | |
| Sewell | 202.90 | 67.97 | 27.84 | 4.79 | 92.68 |
| SEC | 148.80 | 136.52 | 14.69 | 0.00 | 71.55 |
| Owens–Illinois | 37.84 | 0.00 | 37.91 | 0.00 | 33.36 |
| Carolina Packaging | 68.31 | 65.48 | 1.42 | 0.00 | 30.27 |
| PSP | 64.28 | 0.14 | 10.70 | 0.00 | 28.31 |
| Amoco | 37.51 | 0.00 | 0.16 | 0.00 | 13.30 |
| Total | 559.64 | 270.10 | 92.72 | 4.79 | 269.46 |
| **1986** | | | | | |
| SEC | 177.42 | 295.35 | 28.56 | 0.00 | 102.20 |
| Sewell | 183.51 | 45.43 | 33.71 | 10.96 | 88.16 |
| PSP | 70.20 | 22.54 | 22.40 | 0.00 | 38.44 |
| Carolina Packaging | 74.19 | 98.43 | 0.06 | 0.00 | 34.37 |
| Owens–Illinois | 32.44 | 0.00 | 37.80 | 0.00 | 31.40 |
| Amoco | 30.14 | 0.00 | 0.00 | 0.00 | 10.62 |
| Total | 567.90 | 461.75 | 122.53 | 10.96 | 305.19 |

NA = not applicable.
Source: Docket No. 224, Addendum A.